UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

UNITED STATES OF AMERICA        :
            v.                  :        07 Cr 406 (RJS)
CLYDE W. HALL,              :
      a/k/a "P eter Hall," and   :
ANNE HALL,                :        **NOTICE OF**
      a/k/a "Anne Torselius,"   :        **OMNIBUS MOTION**
      a/k/a "Anne Torselius Hall," :
                        :
           Defendants.       :
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLEASE TAKE NOTICE that upon the annexed motion; Memorandum of Law; affidavits of

Clyde Hall, Anne Hall, and Lauren Hall; and upon all prior proceedings, the defendant CLYDE

HALL, by his attorney James A. Cohen, Esq., will move this Court before the Honorable

Richard J. Sullivan, United States District Judge for the Southern District of New York, sitting at

the Daniel Patrick Moynihan United States Courthouse, Courtroom 21C, 500 Pearl St., New

York, New York on a date and at a time designated by the Court:

      1.      Pursuant to Fed. R. Crim. P. 12(b)(3)(D) and 8(a), to sever count five from the

indictment, on the grounds that joinder of the count with the other counts in this indictment is

improper (*i.e.*, misjoinder).

      2.      Alternatively, pursuant to Fed. R. Crim. P. 12(b)(3)(D) and 14, to sever count five

from the indictment, on the grounds that joinder of the count with other counts in the indictment

is unfairly prejudicial.

      3.      Pursuant to Fed. R. Crim. P. 12(b)(3)(C) and 41(h), to suppress all evidence

seized during January 9th search of 270 Riverside Drive.

4.      Pursuant to Fed. R. Crim. P. 12(b)(3)(C), to suppress seized documents, electronic messages and the like that are privileged communication between defendant and his legal counsel.

5.      Pursuant to Fed. R. Evidence 404(b), to request that the Government be directed to disclose all evidence of other or similar crimes, wrongs or acts allegedly committed by defendant upon which the Government intends to introduce at trial sufficiently in advance of trial to permit counsel to investigate.  Such disclosure should include, but not be limited to, the following descriptions of the other alleged crimes, wrongs, or acts the Government intends to offer into evidence against the defendant under Rule 404(b):

a.      The date or dates on which such alleged crimes, wrongs, or acts allegedly occurred;

b.      The place or places at which such alleged crimes, wrongs, or acts allegedly occurred;

c.      The names and addresses of all persons who were witnesses to, or have knowledge of such alleged crimes, wrongs, or acts;

d.      Copies of all documents, materials, or other tangible objects that the Government intends to offer into evidence concerning such alleged crimes, wrongs, or acts;

e.      All exculpatory evidence, within the purview of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), with regard to such alleged crimes, wrongs or acts evidence (*i.e.*, all evidence that detracts from the probative value of the Rule 404(b) evidence, or that indicates that the probative value of the Rule 404(b) evidence might be outweighed by its prejudicial effect); and

2

      f.      A statement of the purpose for offering the Rule 404(b) evidence (*i.e.*, a declaration from the government concerning whether the evidence is being offered to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake accident, or any other such purpose).

6.      Pursuant to *Brady v. Maryland*, to request exculpatory material.   Defendant's request for Brady materials includes, but is not limited to, the following:

      a.      Any written or recorded statement of any person that contains information favorable to the defendant;

      b.      The substance of any oral statement that contains information favorable to the defendant;

      c.      The names and addresses of all persons who have, or who may have, information favorable to the defendant;

      d.      The names and addresses of all persons interviewed by the Government, or any of its agencies, in connection with this investigation but who the Government does not intend to call as witnesses in this case.

      e.      Any information which may tend to adversely affect the credibility of any persons called as a witness by the Government, including the arrest and/or conviction record of each Government witness, and including any offers of immunity or lenience, whether made directly or indirectly, to any Government's witness in exchange for testimony.

7.     Permission to file additional motions.

Dated: New York, New York
       Februrary 4, 2008

                                        Respectfully submitted,

                                        *[signature]*

                                        James A. Cohen, Esq.
                                        Michael W. Martin, Esq.
                                        **LINCOLN SQUARE LEGAL SERVICES, INC.**
                                        33 West 60th Street, 3rd Floor
                                        New York, New York 10023
                                        (212) 636-6934

                                        *Attorneys for Clyde Hall*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :
UNITED STATES OF AMERICA                   :
                    v.                     :              07 Cr 406 (RJS)
CLYDE W. HALL                              :
          a/k/a "P eter Hall," and         :
ANNE HALL,                                 :            **MEMORANDUM**
          a/k/a "Anne Torselius,"          :               **OF LAW**
          a/k/a "Anne Torselius Hall"      :
                                           :
                                           :
               Defendants                  :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CLYDE HALL'S
OMNIBUS MOTION FOR SEVERANCE AND SUPPRESSION OF
EVIDENCE



James A. Cohen, Esq.
Michael W. Martin, Esq.
**LINCOLN SQUARE LEGAL SERVICES, INC.**
33 West 60th Street, 3rd Floor
New York, New York 10023
(212) 636-6934

*Attorneys for Clyde Hall*


*Legal Interns*
Christopher M. Barrett
Chae Kim
Anu R. Sawkar

TABLE OF CONTENTS

Preliminary Statement..................................................................................... 1


Argument

I.    COUNTS ONE THROUGH FOUR SHOULD BE SEVERED
      FROM COUNT FIVE BECAUSE THE COUNTS ARE NOT OF
      THE SAME OR SIMILAR CHARACTER; BASED ON THE
      SAME ACT OR TRANSACTION; OR CONNECTED WITH, OR
      CONSTITUTE PART OF, A COMMON SCHEME OR PLAN............... 1

      A.    *"Based on the Same Act or Transaction"* ......................... 2

      B.    *"Common Scheme or Plan"*......................................... 3

      C.    *"Same or Similar Character"* ...................................... 3

II.   COUNTS ONE THROUGH FOUR SHOULD BE SEVERED
      FROM COUNT FIVE BECAUSE JOINDER OF THE COUNTS IS
      PREJUDICIAL   ................................................................ 4

III.  PRIVILEGED COMMUNICATIONS BETWEEN MR. HALL
      AND COUNSEL SHOULD BE SUPPRESSED ........................... 5

IV.   ITEMS SEIZED DURING THE ARREST OF CLYDE AND ANNE
      HALL SHOULD BE SUPPRESSED BECAUSE THEY WERE
      NOT SEIZED PURSUANT TO A SEARCH WARRANT ............... 7

V.    ITEMS SEIZED DURING THE ARREST OF CLYDE AND
      ANNE HALL SHOULD BE SUPPRESSED BECAUSE THE THE
      SEARCH WARRANT WAS "THE FRUIT OF THE
      POISONOUS TREE" ....................................................... 9

VI.   MR. HALL'S REQUEST FOR DISCLOSURE OF SIMILAR
      CRIMES, WRONGS OR ACTS ALLEGEDLY COMMITTED BY
      HIM SHOULD BE GRANTED ...........................................11

VII.  MR. HALL'S REQUEST FOR DISCOVERY OF BRADY
      MATERIAL SHOULD BE GRANTED .................................12


Conclusion ...................................................................................13

## PRELIMINARY STATEMENT

Severance should be granted because the indictment charges Clyde Hall with two different unrelated crimes. Counts one through four charge Mr. Hall with wire fraud and conspiracy to commit wire fraud, and Count five charges Mr. Hall and his wife, Anne Hall, with bankruptcy fraud. The wire fraud counts are based on an "advance fee" scheme which allegedly involves Mr. Hall promising that he can obtain financing for a "victim" if provided with an advance fee. The Government contends that the fee is then provided but the financing is not. The bankruptcy fraud is based on allegedly false filings in Bankruptcy Court signed by both Halls in the course of attempting to avoid being evicted from their apartment.

Suppression should be granted because: 1) at least in part, the seizure included documents protected under the attorney-client privilege; 2) the Government conducted a full blown search of Mr. Hall's residence before ever being issued a search warrant; and 3) the search warrant is the "fruit of the poisonous tree."

## POINT I

### COUNTS ONE THROUGH FOUR SHOULD BE SEVERED FROM COUNT FIVE BECAUSE THE COUNTS ARE NOT OF THE SAME OR SIMILAR CHARACTER; BASED ON THE SAME ACT OR TRANSACTION; OR CONNECTED WITH, OR CONSTITUTE PART OF, A COMMON SCHEME OR PLAN

The first four counts (wire fraud) should be severed from the fifth count (bankruptcy fraud) because the counts are improperly joined. Joinder of the offenses is governed by Rule 8(a), which states that an "indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . [1] are of the same or similar character, or [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or

plan." Fed. R. Crim. P. 8(a). When determining if joinder is proper under Rule 8(a), "no one

characteristic can be singled out as providing the necessary similarity, and 'each case depends

largely on its own facts.'" *United States v. Smith*, No. 05 Cr 922 (DLC), 2007 WL 980431, at *2

(S.D.N.Y. April 3, 2007) (quoting *United States v. Blakely*, 941 F.2d 114, 116 (2d Cir. 1991)).


### A. *"Based on the Same Act or Transaction"*

The wire fraud offenses and bankruptcy fraud offenses are not "based on the same act or

transaction." (*Compare* Indictment ¶¶ 12 & 14, *with* ¶ 22 (overt acts alleged in indictment)).

There is no factual or legal relationship between the advance fee scheme alleged in the wire

fraud counts and the fraud alleged in the bankruptcy count. Moreover, the alleged frauds

occurred in non-overlapping time periods. *Id.* The acts that constitute the bankruptcy count

occurred between August 2004 and December 2004; whereas the acts that constitute the wire

fraud counts occurred between June 2005 and May 2006. *Id.*

One gauge that shows joinder is proper is when "the same evidence may be used to prove

each count." *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994). However, this is not

present in this case. The wire fraud counts will not "involve substantially the same proof" as the

bankruptcy fraud counts. *United States v. Bezmalinovic*, No. S3 96 CR. 97 MGC, 1996 WL

737037, at *4 (S.D.N.Y. Dec. 26, 1996) (citing *United States v. Sweig*, 441 F.2d 114, 118 (2d

Cir. 1971). In the wire fraud case, the Government will likely attempt to prove wire fraud by

using Mr. Hall's communications between himself and his alleged co-conspirators and alleged

victims. On the other hand, the Government's proof with respect to the bankruptcy fraud count

will revolve around the veracity of the Halls' bankruptcy filings—that is whether the Halls made

false statements in the course of the bankruptcy filing.

### B. *"Common Scheme or Plan"*

Additionally, the wire fraud allegations and bankruptcy fraud allegations are not "connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). The acts as alleged do not constitute a common scheme—the wire fraud counts involve allegations of running an "advanced fee" scheme to defraud while the bankruptcy count involves the filing of fraudulent bankruptcy petitions. The two acts also do not make up a common plan; indeed the alleged bankruptcy violations occurred at least seven months before the wire fraud acts. (*Compare* Indictment ¶¶ 12 & 14, *with* ¶ 22 (overt acts alleged in indictment)).

### C. *"Same or Similar Character"*

Finally, the offenses are not sufficiently "similar" to be considered of a "similar character." The Second Circuit has defined "similar character" to mean "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (quoting Webster's New International Dictionary (2d ed)). The Southern District applied the *Werner* definition in *United States v. Bezmalinovic*, No. S3 96 CR. 97 MGC, 1996 WL 737037, at *3 (S.D.N.Y. Dec. 26, 1996). In *Bezmalinovic*, the Government argued that tax fraud was "of the same or similar character" as contract and insurance fraud because "(1) [defendant's] goal was to obtain and retain money; (2) [defendant] sought to achieve this goal through deception and fraud; and (3) [defendant] carried out his offenses through various companies that he controlled and dominated." *Id.* at *2. The court held the Government's reasoning deficient, stating, "[i]t is true that 'similar' does not mean 'the same.' It is also true that in some senses, all fraudulent schemes are 'similar' to each other. The similarities cited by the Government, however, are not sufficient . . . to be considered of a 'similar character' . . .

within the meaning of Rule 8(a)." *Id.* (citing *Werner*, 620 F.2d at 926). The facts of this case parallel *Bezmalinovic*. The fact that the alleged offenses involve "fraud" is too broad and is insufficient to meet the "similar character" threshold.

POINT II

COUNTS ONE THROUGH FOUR SHOULD BE SEVERED FROM COUNT<br>FIVE BECAUSE JOINDER OF THE COUNTS IS PREJUDICIAL

Alternatively, if the Court finds that joinder is proper, the offenses should be severed because joinder prejudices Mr. Hall. Rule 14 of the Federal Rules of Criminal Procedure which states that "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). In order to prevail, "substantial prejudice must be shown." *United States v. Turoff*, 553 F.2d 1037, 1043 (2d Cir. 1988). It is not enough to show simply that defendant would have had a better chance for acquittal at a separate trial. *See United States v. Corr*, 543 F.2d 1042, 1052 (2d Cir. 1976).

The Second Circuit has noted that "[c]ourts have recognized that 'prejudice may develop when an accused wishes to testify on one but not the other . . . joined offense[] which [is] clearly distinct in time, place and evidence.'" *United States v. Sampson*, 385 F.3d 183, 190-91 (2d Cir. 2004) (*quoting Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1968)). At this time, Mr. Hall does not have such a wish. It is too early to know for certain to what Mr. Hall will or will not testify. For this reason, we request permission to make such a motion closer to trial, if needed.

Furthermore, this case presents a similar but unique circumstance. Mr. Hall is prejudiced by the joinder of the offenses because it creates a situation where his wife—

4

and co-defendant—may not be able to testify on behalf of her husband because she does

not want to be questioned about the charges against her. Mrs. Hall will be forced to make

a difficult decision—one that could substantially weaken Mr. Hall's defense. However,

severing the counts would cure this dilemma. If severed, Mrs. Hall could freely testify in

the wire fraud trial without sacrificing her Fifth Amendment right. Again, given the

difficulty of gauging the necessity and substance of that testimony at this time, we

request permission to make such a motion closer to trial, if necessary.

Additionally, if the allegations are tried together, the Government will be allowed

to make an "end-run" around Rule 404(b) of the Federal Rules of Evidence, which

forbids using evidence of "other crimes, wrongs, or acts" to show that the defendant acted

in conformity with such acts. If these allegations were tried separately, the Government

would be unable to introduce evidence of the other allegation—protecting Mr. Hall from

unfair prejudice.

## POINT III

### PRIVILEGED COMMUNICATIONS BETWEEN MR. HALL AND COUNSEL SHOULD BE SUPPRESSED

Mr. Hall asserts his attorney-client privilege and moves this Court to suppress all

communications listed in the attached privileged logs (*see* privileg logs attached to Clyde Hall

Aff.). Mr. Hall asserts this privilege in both his individual and representative capacity.

Privileges are governed by the common law, *see* Fed. R. Evid. 501, and "[t]he attorney-client

privilege is the oldest of the privileges for confidential communications known to the common

law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The "party invoking the attorney-

client privilege must show (1) a communication between client and counsel that (2) was intended

to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). All communications listed in the attached log were between (i) Mr. Hall and various counsel, (ii) were intended to be confidential; and (iii) were made for the purpose of legal advice. Communications may have either been between Mr. Hall—acting as an individual—and his personal attorney; or between him—acting on behalf of an entity—and its attorney. (*See* Clyde Hall Aff. ¶ 11). In either situation, Mr. Hall has the authority to assert this privilege. (*See* Clyde Hall Aff. ¶ 10).

Mr. Hall asserts the attorney-client privilege on behalf of Gramercy International Investment Trust. A trustee has standing to invoke the attorney-client privilege or the authority to waive it, *Martin v. Valley Nat'l Bank of Ariz.*, 140 F.R.D. 291, 324-25 (S.D.N.Y. 1991), and Clyde Hall has power-of-attorney to act on behalf of Kim Williamson, the trustee of Gramercy International Investment Trust. (*See* Clyde Hall Aff. ¶ 10). It follows that Clyde Hall has standing to invoke the privilege with regards to attorney-client communications between Gramercy International Investment Trust and its attorneys.

Clyde Hall asserts the attorney privilege on behalf of American Swiss Trust LLC. "[T]he power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985). Clyde Hall's son, Alex Hall, is the managing member of American Swiss Trust LLC. Clyde Hall has power-of-attorney to act in his stead. (*See* Clyde Hall Aff. ¶ 10). Neither Alex Hall nor Clyde Hall has waived the attorney-client privilege of American Swiss Trust LLC.

POINT IV

ITEMS SEIZED DURING THE ARREST OF CLYDE AND ANNE HALL
SHOULD BE SUPPRESSED BECAUSE THEY WERE NOT SEIZED
PURSUANT TO A SEARCH WARRANT

On the morning of January 9, 2007, federal agents conducted a broad, warrantless search of 270 Riverside Drive #9A, New York, NY 10025. The agents gained access to the premises because they had arrest warrants for Mr. Hall and Anne Hall. The agents arrived at the Halls' residence between 6:30 and 7:00 a.m. and represented to the Halls that they had a search warrant for the premises (Clyde Hall Aff. ¶ 3). Immediately upon entering the apartment, the agents began searching (Clyde Hall Aff. ¶ 6; Anne Hall Aff. ¶ 6). They opened closets, rifled through desk drawers, dressers, and file cabinets, and examined files on Mr. Hall's computer (Clyde Hall Aff. ¶ 6; Anne Hall Aff. ¶ 6). The agents spent over five hours searching Mr. Hall's office before a search warrant was issued (Lauren Hall Aff. ¶ 4).

"There is no principle more firmly rooted in our constitutional jurisprudence than that warrantless search is presumptively illegal." *United States v. Gamble*, 473 F.2d 1274, 1276 (7th Cir. 1973). The search of Mr. Hall's apartment was neither performed pursuant to a search warrant nor did the search fall under any relevant exception to the warrant requirement. Once inside the apartment, the agents opened and searched inside closets, dressers, and file cabinets in addition to examining files on Mr. Hall's computer ((Clyde Hall Aff. ¶ 6; Anne Hall Aff. ¶ 6; Lauren Hall Aff. ¶ 4); none of these locations qualify under the plain view exception. *See, e.g., U.S. v. Vasquez*, 638 F.2d 507, 530-33 (2d Cir. 1980).

Furthermore, the search was not legitimately conducted incident to lawful arrest. The degree of an officer's right to make a warrantless search incident to arrest is governed by *Chimel*

7

*v. California*, 395 U.S. 752 (1969).  According to *Chimel*, when making an arrest there is generally "ample justification . . . for a search of the arrestee's person and the area within his *immediate control*." *United States v. Mason*, 523 F.2d 1122, 1125 (D.C. Cir. 1975) (construing *Chimel*) (emphasis added). "Of course, Chimel does not permit the arresting officers to lead the accused from place to place and use his presence in each location to justify a search incident to arrest." *Mason*, 523 F.2d at 1126 (internal quotation marks omitted) *quoted in United States v. Whitten*, 706 F.2d 1000, 1016 (9th Cir. 1983); *United States v. Roper*, 681 F.2d 1354, 1359 n.4 (11th Cir. 1982); *United States v. Wright*, 577 F.2d 378, 381 (6th Cir. 1978); *United States v. Griffith*, 537 F.2d 900, 904 (7th Cir. 1976). In other words, the officers "did not have the right to create a situation which gave them a pretext for searching beyond the area of defendant's immediate control." *United States v. Griffith*, 537 F.2d 900, 904 (7th Cir. 1976). In *Chimel*, the Supreme Court explained that

> [t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs-or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less.

*Chimel*, 395 U.S. at 763.

The policy rationale of permitting a warrantless search incident to arrest is (1) to protect the arresting officer from possible attack with weapons and (2) to prevent the destruction of evidence by the arrested person at the time of arrest. *See Chimel*, 395 U.S. 725, 762 (1969).  The agents were not performing a search to ensure their safety.  The facts do not indicate that Mr. Hall presented or was considered to present any threat to the agents.  Indeed, he notified the agents that there were no firearms on the premises.  (Clyde Hall Aff. ¶ 5).  In addition, the agents were not merely protecting evidence from destruction.  They carried boxes out of the office

(Anne Hall Aff. ¶ 6) and continued to do so even after Mr. and Mrs. Hall had been escorted off the premises. (Lauren Hall Aff. ¶ 4).

The agents' actions were an impermissible "confirmatory search." In *Murray v. United States*, the Supreme Court addressed the admissibility of items obtained from a search pursuant to warrant where the officers had entered and surveilled the premises prior to obtaining the warrant. 487 U.S. 533 (1988). The agents in *Murray* did not rely on observations made during the initial entry to obtain the warrant, and the Court determined that the agents' decision to seek the warrant was not prompted by what they had seen during the initial illegal entry. *Id.* at 536, 541. The Court held that such evidence is not admissible if (1) if "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry" or (2) if "information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 543. Both of these conditions pertain to the search conducted at the Halls' residence. The agents used what they saw during their initial entry to obtain the warrant and this information likely affected the magistrate's decision to issue the warrant. (*See* written affidavit in support of search warrant ¶ ¶ 36-37).

POINT V

ITEMS SEIZED DURING THE ARREST OF CLYDE AND ANNE HALL
SHOULD BE SUPPRESSED BECAUSE THE SEARCH WARRANT WAS "THE
FRUIT OF THE POISONOUS TREE"

Mr. Hall moves to suppress the items seized during the January 9th search of the Hall residence because the probable cause underlying the issuance of the search warrant was obtained by illegal search. The initial arrest occurred in the residence's large

foyer—a space with ample floor area to effectuate the arrest. However, because Mr. Hall needed to dress, the agents were authorized—as they did—to escort Mr. Hall to his closet. (*See* Clyde Hall Aff. ¶ 6). The route to the office, where Mr. Hall kept his clothes, was down a long hallway at the opposite end of the apartment. In the march from foyer to office, there is no need to enter any other rooms. However, instead of leading Mr. Hall to get dressed, the agents escorted Mr. Hall into the living room—a room adjacent to the foyer but further away from the office. It is there where the search warrant affiant saw a clipboard, which was mentioned in the search warrant affidavit (*see* Search Warr. Aff. ¶ 37). Because the agents had neither prerogative nor permission to be in the living room, the search of the clipboard was illegal.

The clipboard was used to establish probable cause in the search warrant affidavit. (*See id.* ¶ 37). Because the clipboard, along with an unopened letter, were the only two discoveries mentioned in the search warrant affidavit (*see id.* ¶ 37) and because the agents did not have a search warrant that morning, it follows that the agents believed they lacked probable cause for a valid search warrant pre-arrest. Therefore, the search incident to arrest exception was utilized to obtain the necessary probable cause. Because the clipboard search was the "seed" of the poisonous tree, everything obtained as a consequence is "fruit" of the tree. Consequently, *all* "fruit" of the poisonous tree—tangible and intangible—seized on January 9, 2007 must be suppressed.

Besides being unconstitutional, the items and data should be suppressed as a matter of public policy—to disincentivize the kind of practices displayed that day. An arrest warrant should be used to carry out an arrest and not be abused and converted into a quasi-search warrant.

"[Fourth Amendment prohibitions apply] to all invasions on the part of the government and its employés of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property."

*Hudson v. Michigan*, 126 S. Ct. 2159, 2172 (2006) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

## POINT VI

### MR. HALL'S REQUEST FOR DISCLOSURE OF SIMILAR CRIMES, WRONGS OR ACTS ALLEGEDLY COMMITTED BY HIM SHOULD BE GRANTED

Rule 404(b) states that the Government shall provide the defendant "reasonable notice in advance of trial" of the Government's intent to use such evidence, unless excused for good cause. Fed. R. Evid. 404(b).   The Second Circuit permits the introduction of evidence under Rule 404(b) if  "(1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value, and (4) it is admitted with a limiting instruction if requested."  *U.S. v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir.2003)).

Mr. Hall cannot determine whether any Rule 404(b) evidence offered against him meets this standard unless he is given sufficient time to investigate the evidence.  Even if the Court eventually admits the evidence, due process demands that the evidence be disclosed to Mr. Hall with sufficient advance notice so that he has adequate opportunity to defend against, or rebut, such evidence.  Requiring the Government to disclose any Rule 404(b) evidence that it intends to offer sufficiently in advance of trial will permit counsel to investigate the evidence and determine whether it is inadmissible under applicable precedent and, if so, draft appropriate

11

motions in limine for the Court's consideration prior to trial.  Mr. Hall further asks that the

Government's Notice of any Rule 404(b) evidence that it intends to offer at trial be specific

enough to permit Mr. Hall to properly prepare his defenses concerning the evidence.


## POINT VII

### MR. HALL'S REQUEST FOR DISCLOSURE OF BRADY MATERIAL SHOULD BE GRANTED

Pursuant to the provisions of the Fifth and Sixth Amendments to the Constitution of the

United States, the Government must make available for Mr. Hall's inspection and copying any

evidence or information within the possession, custody or control of the Government, or any of

its agencies, the existence of which is known, or by the exercise of due diligence may become

known, and which is favorable to Mr. Hall on the issue of guilt or innocence or which may tend

to mitigate or lessen punishment in the event the jury should return a verdict of guilty. *Brady v.

Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); *Giglio v. United States*, 405 U.S. 150, 92 (1972);

*United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392 (1976).

CONCLUSION

For all of the aforementioned reasons, it is respectfully submitted that the Court should order the severance of offenses as a result of being improperly joined, or in the alternative, order the severance of offenses because joinder prejudices Mr. Hall; order the suppression of all items seized as a result of a warrantless search, or in the alternative, order the suppression of all items seized because the basis for the probable cause was illegally searched; order the suppression of all items that constitute privileged communications between Mr. Hall and his counsel; and grant such other relief as the Court deems warranted.

Dated: New York, New York
       February 4, 2008

Respectfully submitted,

James A. Cohen, Esq.
Michael W. Martin, Esq.
LINCOLN SQUARE LEGAL SERVICES, INC.
33 West 60th Street, 3rd Floor
New York, New York 10023
(212) 636-6934

*Attorneys for Clyde Hall*

*Legal Interns*
Christopher M. Barrett
Chae Kim
Anu R. Sawkar

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

        v.                                :            07 Cr 406 (RJS)

CLYDE W. HALL                               :
    a/k/a "Peter Hall," and
ANNE HALL,                                  :            **AFFIDAVIT OF**
    a/k/a "Anne Torselius,"                              **CLYDE W. HALL**
    a/k/a "Anne Torselius Hall"            :

             Defendants          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CLYDE W. HALL, the undersigned affiant, hereby swears under oath that the foregoing is true and correct:

      1.     I am Clyde W. Hall—known as Peter, a defendant in the above-captioned matter. On January 9, 2007, I resided at 270 Riverside Drive #9A, New York, NY 10025. I submit this affidavit in support of a joint motion to suppress items taken during the search of my apartment on January 9, 2007. The following facts are based on my personal knowledge.

      2.     Between 6:30 a.m. and 7 a.m. on January 9, 2007, my wife, Anne Hall, heard a loud banging on our front door. She woke me up, and we both went to the door in our robes and night clothes. I asked who was at the door and heard the reply, "It's the FBI!"

      3.     I asked through the door: (1) whether the agents had an arrest warrant and (2) whether the agents had a search warrant. An agent replied "yes" to both questions.

      4.     Because the agents answered affirmatively when I asked if they had a search warrant, I opened the door. If I had not have been told that the agents had a search warrant, I would never have given them access to the apartment, and I would have surrendered myself in the hallway. I was never shown the arrest warrant or the search warrant.

5.      After I opened the door, approximately eight agents from the FBI, IRS and Postmaster General's office entered the premises. They flashed their badges and escorted me into our living room. They told me that they had arrest warrants for myself and Anne. The agents also asked me if we had any firearms. I replied that we did not. I told them that Anne and I needed to make arrangements to have someone watch our 2-year-old child before both of us could leave. One of the agents insisted that they needed to "get me dressed" and "get me downtown."

6.      I entered the hallway to walk back to the office where I kept my clothes. About six agents followed me into the hallway. As we proceeded down the hallway, the agents opened the hallways closets and began to search through them. When we passed by my bedroom, two agents went in to search the bedroom. I saw the agents open our dresser drawers and search inside the dresser and closets. Other agents followed me into my office. Two agents watched me as I dressed. I saw another agent sit at the desk in my office and look at files on my computer. Another agent opened my file cabinet and examined the files. Before we left the office, I saw another agent bring in some empty boxes., The agents never asked for my permission to search nor did I give any.

7.      A female and male agent took me out of the apartment and drove me downtown. My wife remained in the apartment with the agents to take care of our 2-year-old child until my daughter could come to the apartment to care for our child.

8.      Between 1 p.m. and 2 p.m., my attorney Mr. Ginsberg met me downtown. He told me that he had seen AUSA Brown at around 1:00 p.m. and that Brown indicated that Brown had a copy of the Search Warrant, which had just been issued around 1:00 p.m.

2

9.     My wife was held in a proximate cell until we both had our bail hearings before Judge Katz around 3:00 p.m.  After the bail hearing, my wife and I returned to our apartment around 5:30 – 6:00 p.m.  The agents were not in the apartment when we returned.

10.     Kim Williamson, is the trustee of Gramercy International Investment Trust.  I have signed power of attorney to act in her stead.  Alex Hall, is the managing member of American Swiss Trust LLC. I have signed power of attorney to act in his stead.

11.     The documents referenced in the attached privilege logs are correspondence between me and my legal counsel that I believed to be confidential and involved my seeking advice or preparing for potential future legal issues that might arise through the transactions that I made or would have made.

Dated: February 4, 2008
      New York, New York

Respectfully Submitted:

CLYDE HALL

Subscribed and sworn to me this
_4_ day of _February_ 2008

Notary Public
(Affix seal or stamp)

DONNA WELENSKY
Notary Public, State of New York
No. 01WE4608744
Qualified in New York County
Commission Expires Sept. 30, 2029

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

        v.                                    :                    07 Cr 406 (RJS)

CLYDE W. HALL                              :
    a/k/a "Peter Hall," and
ANNE HALL,                                 :                  **AFFIDAVIT OF**
    a/k/a "Anne Torselius,"                                **ANNE HALL**
    a/k/a "Anne Torselius Hall"      :

              Defendants           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANNE HALL, the undersigned affiant, hereby swears under oath that the foregoing is true and correct:

    1.     I am Anne Hall, a defendant in the above-captioned matter. I am married to Peter Hall, a defendant in the above-captioned matter. On January 9, 20007, I resided at 270 Riverside Drive #9A, New York, NY 10025. I submit this affidavit in support of a joint motion to suppress items taken during the search of our apartment on January 9, 2007. The following facts are based on my personal knowledge.

    2.     Between 6:30 a.m. and 7 a.m. on January 9, 2007, I heard a people banging on our front door. I thought they said they were the police, so I woke up my husband. We both went to the front door in nightclothes. I was near my husband at the front door when he asked who was at the door. They said that they were the FBI and asked if Peter was "Clyde Hall."

    3.     Peter asked through the door if the agents had an arrest warrant, and they responded "yes." He also asked if they had a search warrant, and they replied "yes."

4.     Before Peter opened the door, I started back to our bedroom to put on a robe. I came back to the living room—where some agents were located—to hold our dog, a Havanese. The agents showed me their badges and informed me that they were there to arrest me, as well. I called Peter's daughter, Lauren Hall, to come watch my youngest son. I saw several agents follow Peter into his office so he could change his clothes. I was not allowed to speak with Peter, and two agents escorted him out of the apartment.

5.     Between 7 a.m. and 7:30 a.m., I woke my two older children and got them ready for school. Two agents followed me as I moved around the apartment. Sometime between 8:00 a.m. and 9 a.m., Lauren arrived. We decided that she would take my middle son to school. After she left to take my son to school, I went to my bedroom to get dressed and get my youngest son ready. Two agents followed me into my bedroom. They did not allow me to touch anything in the bedroom, but they handed me clothes out of my dresser so I could get dressed.

6.     From the time the agents arrived until I was taken away there were agents in the office. I did not go into the office, and one of the agents blocked my view into the office. The office was the site of much activity, and I saw the agents carry a stack of flat unassembled boxes towards the office. At one point, I heard someone say that they needed more boxes. I also saw agents carrying full boxes out from the office towards the front door. I felt like the agents were taking over the house. They were opening closet doors in other rooms of the apartment. Three to four agents were still in Peter's office when I was escorted out of the apartment between 10:30 a.m. and 11 a.m.

7.     There is a printer in our living room. While I was in the living room, one of the agents walked into the room and noticed the printer. He said, to no one in particular, that they

were unable to make the printer in the office work, and he wondered if they could use the printer

from the living room.



Dated:  February 4, 2008
        New York, New York

                                        Respectfully Submitted:

                                        _Anne Torseling Hall_
                                        ANNE HALL

Subscribed and sworn to me this
    4 day of  Feb , 2008
       _D Welensky_
        Notary Public
     (Affix seal or stamp)

            DONNA WELENSKY
        Notary Public, State of New York
             No. 01WE4608744
         Qualified in New York County
       Commission Expires Sept. 30, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :

               v.                :        07 Cr 406 (RJS)

CLYDE W. HALL                                     :
    a/k/a "P eter Hall," and            :
ANNE HALL,                                          :        **AFFIDAVIT OF**
    a/k/a "Anne Torselius,"            :        **LAUREN HALL**
    a/k/a "Anne Torselius Hall"     :
                                                              :
           Defendants                :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

LAUREN HALL, the undersigned affiant, hereby swears under oath that the foregoing is true

and correct:

      1.      I am Lauren Hall, daughter of Peter Hall, a defendant in the above-captioned

matter.  The following facts are based on my personal knowledge.

      2.      Between 7:00 a.m. and 7:30 a.m. on January 9, 2007, I received a phone call from

my stepmother, Anne Hall.  She told me that the FBI was arresting both her and my father, Peter

Hall, and asked if I could come to the apartment on 270 Riverside Drive #9A, New York, NY

10025 to watch my youngest half-brother Marcus.

      3.      When I arrived at the apartment, I found out that the FBI wanted to escort my

other half-brother, Myles, to school.  I didn't want Myles to be scared by the experience of being

taken to school by the FBI, so I volunteered to take him to school.

      4.      As I returned to the apartment at about 10:30 a.m., I ran into Anne in the lobby as

she was being escorted out of the building by agents.  While I was in the apartment, there were

several agents—at least seven—walking around, opening closet doors and drawers in the main bedroom, closets in the hallway, cabinet in the dining room. I saw agents searching in the living room, the dining room, and the room adjacent to the foyer.

5.    As I walked back down the hallway I saw agents going through the closets and the dresser drawers in my dad's bedroom. I wanted to make phone calls and I know that he keeps a list of contact numbers for family members and his lawyers on a clipboard. I noticed that the agents in the living room had the clipboard. They were looking through the pages of the clipboard. The agents would not let me take the clipboard unattended—I was told that the clipboard was very important, and I told them that I needed some of the phone numbers from the list.

6.    After I was permitted to take the clipboard, I went to the back of the apartment to the room my dad uses as his office to make phone calls. An agent blocked my access to the office and refused to let me enter. The agent told me that I didn't have the right to enter the office because I was not a resident. The agent also told me that I needed to stay in view of the agents at all times. I told the agents to stop going through my dad's possessions. They told me that I did not have the authority to prevent them from searching because I was not a resident of the house. I argued with the agent, but to no avail. Before 1:00 p.m., I saw agents bring papers from the office to show to other agents near the front of the apartment.

7.    After I had the clipboard for an hour or two, but before 1:00 p.m., a U.S. Marshal named John took the clipboard away from me and refused to give it back. He told me he would give me specific phone numbers that I needed. John also told me that they were waiting for a warrant, at which time I asked why they were going through everything without one; he told me that they had a search warrant for the house, but needed one for the office.

2

8.    Between 1:00 p.m. and 1:30 p.m., I heard someone say that a search warrant had been granted. I asked to see it. The agents initially refused. I called Lee Ginsberg and asked him if there was a search warrant, and he said that he would look into it. He subsequently told me that he thought a warrant had been granted in the afternoon. I nagged one of the agents to see the warrant, and he eventually showed me the top of a piece of paper. While the paper had the word "warrant" at the top, he would not show me the rest of the paper, and I never saw my dad's name or the apartment's address on the page.

9.    After the agents received the call about the warrant, the activity in the apartment increased—there was more movement, more boxes, more people, different people. The agents allowed me to survey the office from the doorway but they would not let me into the office.

Dated:  February 4, 2008
        New York, New York

Respectfully Submitted:

_____
LAUREN HALL

Subscribed and sworn to me this
_____ day of _____, 2008

_____
Notary Public
(Affix seal or stamp)

DONNA WELENSKY
Notary Public, State of New York
No. 01WE4608744
Qualified in New York County
Commission Expires Sept. 30, 20__

3