UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA                  :
                                          :        07 Cr 406 (RJS)
             v.                           :
                                          :
CLYDE W. HALL,                            :
        a/k/a "Peter Hall," and           :        **MEMORANDUM**
ANNE HALL,                                :        **OF LAW**
        a/k/a "Anne Torselius,"           :
        a/k/a "Anne Torselius Hall,"      :
                                          :
             Defendants.                  :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## POST-SUPPRESSION HEARING MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' MOTION TO SUPPRESS EVIDENCE

James A. Cohen, Esq.
Michael W. Martin, Esq.
LINCOLN SQUARE LEGAL SERVICES, INC.
33 West 60th Street, 3rd Floor
New York, New York 10023
(212) 636-6934
*Attorneys for Clyde Hall*

*Legal Interns*
Christopher M. Barrett
Eva A. Belich

# TABLE OF CONTENTS

STATEMENT OF FACTS ...................................................................................................1

I.    BECAUSE THE GOVERNMENT FAILED TO MEET ITS BURDEN OF
      JUSTIFYING THE WARRANTLESS SEARCH, ALL EVIDENCE SEIZED
      PURSUANT TO THE SUBSEQUENTLY ISSUED WARRANT SHOULD
      BE SUPPRESSED ...................................................................................................2

A.    *The Clipboard and Envelope Were Not in "Plain View"* ...............................2

      1.    The Allegedly Incriminating Nature of the Clipboard Was
            Not Immediately Apparent ....................................................................3

      2.    The Incriminating Nature of the Envelope Was Not
            Immediately Apparent ..........................................................................5

      3.    The Search Prior to the Issuance of the Search Warrant
            Was Pretextual .....................................................................................8

B.    *Alternatively, Even Assuming the Clipboard or Envelope
      Were Readable, They Are Not Within the Plain View
      Exception if They Must Be Read in Order for Their
      Incriminating Nature to Be Apparent* ..........................................................13

C.    *The Independent Source Doctrine Does Not Apply* ......................................14

      1.    Without the Envelope or Clipboard, There Is Insufficient
            Probable Cause to Issue a Warrant .....................................................15

      2.    The Illegal Search Prompted the Decision to Seek the Search
            Warrant ...............................................................................................16

APPENDIX: LIVING ROOM .......................................................................................18

## STATEMENT OF FACTS

The Government has been investigating Clyde Hall and Anne Hall (the "Defendants") for approximately two years prior to their arrest on January 9, 2007. (*Id.* at 120:6–18.) The Government was aware that the Defendants resided at the same location for at least 18 months prior to the Halls' arrest. (*Id.* at 130:1–131:2.) An investigator for the United States Attorney's Office of the Southern District of New York, Jon Adler, and Assistant U.S. Attorney Thomas Brown discussed getting a search warrant several times in the months before the arrest, but failed to do so. (*Id.* at 121:13–122:1.) On the morning of the arrests, a team composed of members of four government agencies had a meeting (*id.* at 8:9–9:8), during which the agents were told to keep their eyes open. (*Id.* at 355:2–5.) In the unusually long time that it took the agents to arrest the defendants and remove them from the premises, the agents saw and read a clipboard and envelope, which they claim connected the defendants to criminal activity. (*Id.* at 24:5–6; 162:22–25.) The agents subsequently relied on these items in a search warrant affidavit to assert that they had probable cause to search the apartment. (Search Warr. Aff. ¶ 36.)

I.    **BECAUSE THE GOVERNMENT FAILED TO MEET ITS BURDEN OF JUSTIFYING THE WARRANTLESS SEARCH, ALL EVIDENCE SEIZED PURSUANT TO THE SUBSEQUENTLY ISSUED WARRANT SHOULD BE SUPPRESSED**

The suppression hearing focused on two items—a clipboard and an envelope—both of which were read by government agents during the execution of the two arrest warrants in the defendants' apartment.  At the time of the discovery of the items a search warrant had not been authorized.  When a "defendant has produced sufficient evidence that he was . . . subjected to a search without a warrant, the federal rule is that the burden shifts to the government to justify the warrantless arrest or search." *United States v. Arboleda*, 633 F.2d 985, 993 (2d Cir. 1980) (Friendly, C.J.).  The Government, therefore, has the burden of justifying the warrantless search of the Halls' home.  It has not met this burden.

A.    *The Clipboard and Envelope Were Not in "Plain View"*

The term "plain view," in its legal sense, does not mean visible—it means much more.  The "plain view" doctrine applies only if

> it is *immediately apparent* that the object is connected with criminal activity, and further provided that the officers viewed the object from a lawful vantage point—i.e., that the officers have not violated the Fourth Amendment in arriving at the place from where they can see the object.

*United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 81 (2d Cir. 2002) (emphasis added).  Although the clipboard and the envelope may have been visible, they were not in "plain view" because their allegedly incriminating nature was not immediately apparent.

### 1.    The Allegedly Incriminating Nature of the Clipboard Was Not Immediately Apparent

In order for the clipboard to be incriminating the agent must have read its contents.  Reading the contents without a search warrant violates the Halls' reasonable expectation of privacy in documents in their own home.  Adler's testimony never places him in a lawful position to have read the contents of the clipboard.  Adler testified that:

> Q.  Before you left the living room were you sitting on the couch next to Mr. Hall explaining this to him?
> A.  Yes, I was.
> Q.  Did you see anything that you took note of?
> A.  On the-- yes.  I saw a clipboard and it had names and contact numbers on it.
> MR. STELLMACH:  Your Honor, I am showing the witness what has been marked as Government Exhibit 2.  This is the actual clipboard as opposed to the first page which was produced as part of the exhibits for this hearing.  The actual contents of clipboard have been produced in discovery.
> THE COURT:  Let me hear him say what it is.
> MR. STELLMACH:  Sure.
> THE COURT:  Do you recognize this?
> THE WITNESS:  Yes, your Honor.
> THE COURT:  What is it?
> THE WITNESS:  This is the clipboard I just referred to that I saw while I was speaking to Mr. Hall during our conversation.
> THE COURT:  How do you recognize it?
> THE WITNESS:  Well, it actually was in the same way it was just handed to me even with this business card, which I believe being up here as well.  And I recall one of the names  jumped out to me because it was relevant to your investigation, Kim Wilson, and I remember seeing that as well.  I recognize it by way of format, the business card, and the name on there.
> THE COURT:  There are multiple pages on there, right?
> THE WITNESS:  Right.

(Suppress. Hr'g Tr. 23:6–24:8.)

                                    * * *

> THE COURT:  Let me interrupt.  Where did you observe this clipboard?
> THE WITNESS:  The clipboard was -- in relation to the couch, it would be underneath on the diagram where it says "14-2" right where the numbers

are, right in that area on top of a table.  (Referring to GX 1, the floor plan of the Hall's apartment.)

(*Id.* at 24:18–23.)

Adler testified that upon entering the apartment he escorted Mr. Hall into the living room, and sat with him on the couch. (*Id.* at 21:25–22:3, 23:6–23:8.)  Adler was sitting with his back to the private hall. (*Id.* at 79:22.)   Using the floor plan in Government Exhibit 1, Adler indicated that the couch was located on top of the word "Living Room," (*Id.* at 22:1–2), and Lauren Hall specifically said it was on top of the "L" of the word "Living Room." (*See Id.* at 22:1–2, 547:22–548:2.)  Adler stated that the clipboard was on a *table*.  Agent Paliska testified that the clipboard was located on the desk. (*Id.* at 271:14–21.)  Agent Walker testified that he saw the clipboard on a *table*, yet when asked where the table was, he said, "I don't recall." (Id. at 164:19–22.  Up until the Court's question on page 24 quoted above, the testimony is ambiguous, possibly suggesting that Adler saw and read the clipboard while he was on the couch.  But we know that is not the case because Adler never said that the clipboard was on a "coffee" table; indeed he describes the clipboard on a table that is below the "14-2" numbers.  The only "table" in the area described by Adler is the desk.

Indeed, the totality of evidence places the clipboard on the desk.  The photographs taken by the agents show the clipboard on a desk next to a window (Defs.' Ex. C, D, E.)  The purpose of the photos was to show the condition before the search. (*Id.* at 92:10–11.)  It simply makes no sense that the agents found the clipboard on the coffee table but would choose to stage a photograph on the desk

4

with the clipboard facing the window.[1]   Moreover, the evidence from several sources including the "before" photos (Defs.' Ex. C, D, E), Lauren Hall's description of the living room, and the testimony referred to above prove that the clipboard was on the desk. (*See* Appendix:  Living Room.)

The location of the desk is clearly established.  Based on Ms. Hall's description of the living room, we know that the desk is on the southern wall and in eastern half of the living room. (*See* Defs.' Ex. 1B.)  By comparing the original floorplan (which shows the windows[2]) and the photos of the desk (which shows the desk's location relative to the window), we can determine the exact location of the desk. (*Compare* Gov't's Ex. 1A, *with* Defs.' Ex. C, D, E.)  Although, Lauren drew the layout on the Government's altered floorplan, which lacked windows, she accurately depicted the location of the desk. (*See* Defs.' Ex. 1B.)  It is clear from the location of the desk and the location of the clipboard on the desk, no agent was ever lawfully in a position to read the contents of the clipboard.

##### 2.    The Incriminating Nature of the Envelope Was Not Immediately Apparent

The agents also testified to seeing an envelope in "plain view," but the record does not support this assertion.  Even if an envelope were visible, one cannot conclude from the record that its allegedly incriminating nature was immediately apparent.

---

[1] It is noteworthy that neither Adler nor Walker characterized the "table" as a "coffee" table which would have been the most natural way to have described it had the clipboard been on the coffee table.

[2] The Government's altered floorplan does not show location of windows.

First, there is no clear evidence of what the envelope looked like, either through testimony or an exhibit.  The envelope was not introduced into evidence. Adler and Walker (the only two agents who testified that they saw the envelope) could not say whether it appeared in any photograph provided by the government.[3]

Furthermore, the evidence that is on the record is contradictory. The search warrant affidavit says that the envelope was addressed to "GIIT," and had the defendants' address on it. (*See* Search Warr. Aff. ¶ 36.)  At the hearing, however, the Court sought clarity from Adler:

> *21* MR. COHEN: Mr. Adler, I think you said you learned about the
> 22 clipboard, about this envelope with GIIT on it, addressed to
> 23 GIIT, right?

---

[3] 18 THE COURT: That's the envelope or that is where you
19 found the envelope?
20 MR. ADLER: That is where I saw the envelope right
21 over there.
22 THE COURT: Is the envelope in this picture?
23 MR. ADLER: I can't say for sure, Judge, it is not
24 clear enough.. (*Id.* 18–24 (Direct Adler)).
              ***
23 Q. Can you tell us where on the desk you saw this envelope
24 that you said was significant?
25 A. Somewhere I guess from this photo to the left of the phone.
1 Q. Can you use the laser pointer to designate it briefly?
2 A. In this area.
3 MR. BROWN: Let the record reflect the agent is
4 designating a pile of white paper next to the telephone in the
5 picture.
6 THE COURT: How close is that to the closet?
7 THE WITNESS: Behind the closet. The closet is on the
8 opposite wall.
9 THE COURT: Pull up 3A if you wouldn't mind.
10 Looking at 3A, your copy is probably better than what
11 is on the screen, but looking at that and using the laser
12 pointer on the screen can you show me where the envelope was
13 and where the closets were?
14 THE WITNESS: The envelope was here.
(*Id.* 161:23–162:14 (Direct Walker).)

6

24 THE COURT: Was it the initials or was it the name?
25 THE WITNESS: I think it was the name Gramercy, yes.

(Suppress. Hr'g Tr. 118:24 –25.)  Agent Walker testified later as follows:

21 MR. BROWN: In what way was the envelope significant?
22 WALKER: The return address of the envelope said Gramercy
23 International Investment Trust.

(*Id.* at 162: 21–23.)

From these contradictions one cannot conclude that the envelope had an immediately apparent incriminating nature.  We do not know whether the it said "GIIT" or "Gramercy International Investment Trust;" we do not know how large the type was, or even whether it was typed or handwritten; we do not even know if it was the recipient's address or return address.

Agent Walker testified that he first saw the envelope when he accompanied Mr. Hall into the office.  He testified on cross as follows:

Q.  Were you at the desk or was Mr. Adler at the desk?
A.  I don't think either of us were at the desk.
Q.  Didn't you see an envelope at the desk?
A.  Yes, I did.
Q.  Wasn't the envelope on the desk?
A.  Yes, it was.
Q.  So how far from the desk were you when you saw it?
A.  Close enough to see it.  So probably maybe three feet, five feet.
Q.  If it is five feet, it would make it 12 feet away approximately or 10 feet away from Mr. Hall, correct?
A.  Correct.
Q.  Isn't it fair to say while Mr. Hall was getting dressed either you or Mr. Adler were looking around?
A.  Yes.  We weren't totally right on top Mr. Hall who was getting dressed.  It was a matter of privacy of some sort.
Q.  You were looking around during the time he was getting dressed?
A.  Yes.

7

(*Id.* at 185–86.)

The government has failed to prove that from three to five feet away Walker and Adler could immediately conclude that the envelope was connected with any criminal activity.  Because the allegedly incriminating contents of the clipboard and the envelope were not "immediately apparent" from the agent's lawful vantage points, neither item qualifies for the plain view exception to the need for a search warrant.

### 3.    The Search Prior to the Issuance of the Search Warrant Was Pretextual

The Suppression Hearing record clearly supports the fact that the arrest warrants, though valid, were used as an excuse to enter the Halls' home so that agents could look around and do precisely what they did—read documents.[4] According to *Chimel v. California*, 395 U.S. 752 (1969), when making an arrest there is generally "ample justification . . . for a search of the arrestee's person and the area within his immediate control."  *United States v. Mason*, 523 F.2d 1122, 1125 (D.C. Cir. 1975) (construing *Chimel*).  However, "*Chimel* does not permit the arresting officer to lead the accused from place to place and use his presence in each location to justify a search incident to arrest." *Mason*, 523 F.2d at 1126 (internal

---

[4] The Court even suggested this when it observed:

I think the point that is being made by Mr. Cohen on cross is that this arrest took an awful long time. Normally you get to go in there, slap cuffs on somebody and get out of there in 10 minute, half hour.  There were children in this apartment so that did elongate the process.  I think what Mr. Cohen was trying to show was that this whole thing was fishing expedition to see what could be gathered to support a search warrant.

(Suppress. Hr'g Tr. 118:11–14 (Court construing our argument).)

quotation marks omitted) (emphasis added).   The agents' testimony, however,

proves the agents intended to do just that.

In his testimony regarding the pre-operation meeting, Adler said:

During the meeting, and what I would typically remind people of is to
be mindful of anything they observe in the course of executing an
arrest warrant obviously *if they see anything relevant to our
investigation that might factor in or add to probable cause, but it
wasn't a specific mission statement.*

(Suppress. Hr'g Tr. 10:15-21 (emphasis added).)  Agent Walker testified that such

conduct is a "common procedure."

THE COURT:  Was there any discussion about looking to see if there
were things in plain view that could be the basis for a search warrant?
THE WITNESS:  I don't exactly recall.  I couldn't say there wasn't
anything like that.  *It is common procedure when we are going in for
an arrest warrant, if we don't have a search warrant, we would look for
items in plain view.*  I would say it is possible that we may have said
that.

(*Id.* at 151:14–21 (emphasis added).)[5]  Agent Walker further testified that anything

he sees in plain view can be used obtain a search warrant.

---

[5] And disturbingly, the agents appeared to have been trying to mislead anyone
who inquired into the events of January 9 by creating Exhibit 3501—a document
without a date, that clearly discusses past events as if they were about to occur.
Adler's testimony confirmed that the document was created two days after the
search and arrests it describes.  (*Id.* at 508: 21–23.)

THE COURT: All right. But was it designed to mislead them into believing
that this operation plan had been prepared in advance of the operation.
                                    * * * *
THE COURT: No, I get that. Here's the point. What is the purpose of having a
written option plan that is written after the fact, other than perhaps to mislead
upper management? I don't understand what purpose is served by this
document.
THE WITNESS: It's -- it's basically a CYA type of, you know, getting -- this is
what we need, this is what's in there.

(*Id.* at 373–74 (Gorra cross).)

Q.  When you went to the office was it your purpose to look for documents that you believed might be involved in the bankruptcy fraud?

A.  Was it my purpose, no.

Q.  Did you intend to do that when you went into the office?

A.  How do you mean "intend"?

Q.  Well, when you went into the office, did you look specifically to see if you could find documents that were involved in bankruptcy fraud?

A.  Through training and experience, I know that if I don't have a search warrant if I see anything in plain view, we can use it to obtain a search warrant.  For me to say that I put blinders on and did not look would not be a true characterization.  To say that I went and aggressively and looked for anything would also be not a true characterization.

(*Id.* at 212:13–13:2.)

Agent Walker, testified  "[t]hat any time [government agents] are in a place lawfully, anything that is seen in plain view, meaning obviously there, . . . can be used later on." (*Id.* at  152:7–9.)   Plain view, however, does not mean "obviously there."  Gorra stated that, "As a trained federal agent, I know that anything that is seen in plain view is, is open to being looked at.  I can't rifle through things, but I can actually look at anything that I don't have to touch just to read." (*Id.* at 312:14–17 (emphasis added).[6]

The Government has stated in its memorandum of law in opposition that "evidence discovered in plain view during a *valid* protective sweep is admissible." (Gov't's Mem. Opp. 29.)  Under the facts of this case, however, such a sweep is

---

[6] Nor do they appreciate that a "protective sweep" is unconstitutional unless there is a reasonable belief "that the area swept harbored an individual posing a danger to the officer or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990); The Agents' overall assessment of risk, ex ante, was "LOW" (Defs.' Ex. G).)

*invalid* and unconstitutional.  According to the Supreme Court, a protective sweep of a home is only legal if the officers "possess[] a reasonable belief based on specific and articulable facts which, taken together with the inferences from those facts, reasonably warrant[] the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990); *see also United States v. Miller*, 430 F.3d 93, 97 (2d Cir. 2005) (applying *Buie* test).  The facts here show that such belief is objectively unreasonable. Because Mr. Hall was permitted to remain unhandcuffed, the agents subjectively felt no danger. (Suppress. Hr'g Tr. 25:11.)  Agent Walker, on direct, describes the protective sweep:

> Q.  What happened once the door opened?
> A.  We entered the apartment.  We took Mr. Hall to the side and the rest of the agents conducted a protective seep of the residence.
> Q.  You say we took Mr. Hall to the side, who is "we"?
> A.  Myself and Jon Adler.
> Q.  You said to the side. what location are you referring to?
> A.  Into the living room.
> Q.  You are referring to what is marked on Exhibit 1 as the living room, correct?
> A.  Correct.
> Q.  When you say other agents conducted a protective sweep, can you tell us what that means?
> A.  That means that the agents walked through the house or go through the house looking for anything else that could harm us, making sure no one else is home and if they are home they are secured.
> Q.  Did you see any agents walking through the house?
> A.  Yes.
> Q.  What did you observe them doing?
> A.  Generally walking around looking for anything that can harm us.
> THE COURT:  Explain that in more detail.  What were they doing?
> THE WITNESS:  Looking for any other persons that would be in the house, any weapons, anything that could adversely be used against us.
> THE COURT:  Were they looking in drawers?

THE WITNESS:  No.
THE COURT:  Were they looking in closets?
THE WITNESS:  Possibly closets.

(Id. at 156:20–57:25.)

Though there are cases which indicate an officer's subjective intent is irrelevant to whether there was probable cause to conduct a search.  These cases typically occur in the context of a traffic stop which yields contraband, but the court subsequently finds that the stop was mere pretext for a search of the vehicle. Rather than penalize the prosecution by depriving  it of evidence, if the search was objectively reasonable the court would still admit the contraband as evidence. However, none of these cases involve the combination of facts present here.  First, the United States Attorney's Office was substantially involved in this investigation from the beginning.  An Assistant U.S. Attorney and an Investigator have worked on this investigation for at least two years.  Second, the subject of the "plain view" search is a residence, which is typically accorded a much higher level of protection under the Fourth Amendment.  Third, the items searched were documents as opposed to obvious contraband, such as drugs, guns, etc.  Documents are accorded a higher measure of protection from government scrutiny.[7]

---

[7]  *See Crouch v. United States*, 454 U.S. 952 (1981) (White, J.) (discussing why the petition for certiorari should have been granted) ("To extend, by means of the plain-view doctrine, a search authorized by a warrant to the reading of personal papers not included within the terms of that warrant raises extraordinarily important questions. One of the historical purposes of the Fourth Amendment was to bar the indiscriminate search/reading of personal papers under the authority of general warrants. *Marcus v. Search Warrant*, 367 U.S. 717, 724-729, 81 S.Ct. 1708, 1712-1714, 6 L.Ed.2d 1127 (1961). To include perusal of letters or documents enclosed within the plain-view exception to the warrant requirement may threaten to expand the bounds of legitimate search warrants and legitimate warrantless searches so far as to authorize in effect general searches.

**B.    Alternatively, Even Assuming the Clipboard or Envelope Were Readable from the Agents' Lawful Vantage Points, the Items Are Not Within the Plain View Exception if They Must Be Read for Their Incriminating Nature to Be Apparent**

Even assuming the clipboard was within three feet of Agent Adler,[8] if he had to read the clipboard in order for its incriminating nature to be determined, the plain view exception will not apply. *See United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007) ("The precise issue we must address here is whether a document, even though in plain view, is within the plain view exception if it must be read in order for its incriminating nature to be determined. We hold that it is not."). The first page of the clipboard lists 28 names in no particular order and there was also a business card located on top of the page. Yet, Adler testified that "Kim Wilson" jumped out to him. (Supp. Hr'g Tr. 24:1-6.) It is most likely that Kim Wilson was not the first name he saw. Rather, he read the first page looking for recognizable names. This is impermissible.

> Because the plain view doctrine supplants the need for a particularized warrant, the "immediately apparent" requirement is necessary to prevent officers from using the plain view doctrine as a means to extend a particularized search authorized by Fourth Amendment principles into an unlawful exploratory search. *See Horton v. California*, 496 U.S. 128, 136-37 (1990); *Arizona v. Hicks*, 480 U.S. 321, 334 (1987) (O'Connor, J., dissenting) ("The purpose of the immediately

---

Furthermore, petitioners strongly urge the analogy between the facts of this case and those of *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). *Walter* held unconstitutional the unauthorized viewing by the police of films properly in their possession. Exposure of the contents of the film, which we held to require previous judicial authorization despite the presence of probable cause, is not very different from exposure of the written contents of the letters here-an exposure not even supported by probable cause. Cf. *Stanley v. Georgia*, 394 U.S. 557, 569, 89 S.Ct. 1243, 1250, 22 L.Ed.2d 542 (1969) (Stewart, J., joined by BRENNAN and WHITE, JJ., concurring in result)).

[8]  Our main argument is that clipboard and the envelope were not readable; this alternative argument is that even if readable, reading is not permitted without a warrant.

apparent requirement is to prevent general, exploratory rummaging in a person's belongings.") (internal quotations omitted). An overbroad reading of the immediately apparent requirement subverts and jeopardizes fundamental Fourth Amendment principles.

*Id.*

### C.    *The Independent Source Doctrine Does Not Apply*

The Government has not shown that an exception to the exclusionary rule applies. Once the "defendant has produced sufficient evidence that he was . . . subjected to a search without a warrant, the federal rule is that the burden shifts to the government to justify the warrantless arrest or search." *United States v. Arboleda*, 633 F.2d 985, 993 (2d Cir. 1980) (Friendly, C.J.).

According to the Government, even if the agents "conducted a wholesale illegal search" of the Hall home, the motion to suppress would fail because there "existed more than sufficient probable cause to obtain the warrant independent of the results of the alleged illegal search." (Gov't's Opp. 21–22.) The government, however, misstates the independent source doctrine. Having an independent source is only one prong of the doctrine. In order for the doctrine to apply, the government must show that "(1) the warrant [is] supported by probable cause derived from sources independent of the illegal entry; *and* (2) the decision to seek the warrant [was] not prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993) (construing *Murray v. United States*, 487 U.S. 533 (1988)).[9]

---

[9] Many of the other circuits follow the same rule. *See, e.g.*, *United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996); *United States v. Hill*, 55 F.3d 479, 479 (9th Cir. 1995); *United States v. Markling*, 7 F.3d 1309, 1316 (7th Cir. 1993); *United States v. Halliman*,

It is telling that the Government chose not to apply for a search warrant even though the other evidence in the affidavit was known months—and years— before the illegal search.  The Assistant U.S. Attorney's and the respective agency team leaders' opinion not to apply for a warrant, even though subjective, is probative.

According to Agent Gorra, Adler may have believed the evidence in the search warrant lacked probable cause and was stale. (*See Id.* at 392:9–12 (testimony of Gorra about conversation with Adler prior to the search).) Gorra, herself, even stated she "assume[d] it was stale." (*Id.* at 401:25–402:1.)

1.    **Without the Envelope or Clipboard, There Is Insufficient Probable Cause to Issue a Warrant**

Without the envelope and the clipboard, the search warrant affidavit lacks probable cause. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Only two paragraphs in the whole affidavit link 270 Riverside Drive to the wire fraud allegations.  The first is reference to a civil complaint (Search Warr. Aff. ¶ 35.a.iii at 20.), which is very weak.  It is not specific and does not state the source of the information.  The second is reference to Trust Agreements that Mr. Hall allegedly executed.  But these agreements are not even appended to the Search Warrant application.  So besides these two pieces of information, there is no

923 F.2d 873, 880 (D.C. Cir. 1991) (Thomas, C.J.) (Ginsburg, J., also on the panel); *United States v. Herrold*, 962 F.2d 1131, 1144 (3d Cir. 1992).

evidence that "contraband or evidence of a crime will be found" at 270 Riverside Drive.

### 2.    The Illegal Search Prompted the Decision to Seek the Search Warrant

Even if the clipboard and envelope are not needed to establish probable cause, if either one prompted the decision to seek warrant, everything seized pursuant to the warrant must be suppressed. "[T]he relevant question is whether the warrant 'would have been sought even if what actually happened had not occurred.'" *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993) (quoting *Murray*, 487 U.S. at 542 n.3).

None of the Government's witnesses offered any reason why they did not apply for the search warrant in the year and a half prior to the warrantless search. Yet, once they saw the clipboard and the envelope, they drafted the affidavit and applied for one. (Supp. Hr'g Tr. 37:11-14.)  The only conclusion is the clipboard and the envelope prompted the decision—they were the trigger.

16

Dated:      August 22, 2008
                New York, NY
                This document has been electronically filed.


Respectfully submitted,

s/ James A. Cohen

JAMES A. COHEN, Esq.
MICHAEL W. MARTIN, Esq.
Attorneys for Clyde Hall
LINCOLN SQUARE LEGAL SERVICES, INC.
33 West 60th Street, 3rd Floor
New York, New York 10023
(212) 636-6934

*Legal Interns*
Christopher M. Barrett
Eva A. Belich

17



APPENDIX:  LIVING ROOM



The above representation is not admitted into evidence; but is, rather, based on the evidence.  The background layout is from the original floor, which is in evidence.  The layout of the furniture and the location of the clipboard are also based on the evidence.

(*a*)    **Living room set up.**
  1.   **Defs.' Ex. 1B**:  Lauren Hall's depiction of furniture arrangement.
  2.   **Suppress. Hr'g Tr. 285–87:**  On direct, Lauren testified about layout.
  3.   **Suppress. Hr'g Tr. 2:1–2**:  On direct, Adler stated, "If you look at the word "living room" on top of it, there was a coach there."

(*b*)    **Christmas tree.**
  1.   **Gov't's Ex. 3I,** *and* **Defs.' Ex. E.:**  show what appears to be an average-sized Christmas tree in front of the desk.

(*c*)    **Location of Desk.**
  1.   **Defs.' Ex. 1B:**  Lauren Hall's depiction of furniture arrangement.
  2.   **Defs.' Ex. C, D, E:**  Shows the  position of the desk relative to the window.
  3.   **Gov't's Ex. 1A:**  Original floorplan shows the placement of the window.

**Placement of Clipboard**

1.     **Defs.' Ex. C, D, E:**  Shows the placement of the clipboard on the desk.

2.     **Suppress. Hr'g Tr. 24:18–23:**  Adler on direct:

> THE COURT:  Let me interrupt.  Where did you observe this clipboard?
> THE WITNESS:  The clipboard was -- in relation to the couch, it would
> be underneath on the diagram where it says "14-2" right where the
> numbers are, right in that area on top of a table.

Although, Adler's testimony does not comport with the layout of the living
room, it is beyond a doubt that he did not mean it was on the coffee table.


3.     **Suppress. Hr'g Tr. 271:14–21:**  Paliska cross

> Q. Well, isn't the clipboard that's shown on there -- isn't the clipboard that's
> shown on there the clipboard about which you testified on the 13th?
> A. Yes.,
> Q. And that's the location that the clipboard was in when you were present in
> the apartment?
> A. It was moved about a couple of times, but I believe it was there.