UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :

UNITED STATES OF AMERICA           :
                                         :

       - v. -                :      07 Cr. 406 (RJS)
                                         :

CLYDE W. HALL,                 :
  a/k/a "Peter Hall," and       :
ANNE HALL,                  :
  a/k/a "Anne Torselius,"       :
  a/k/a "Anne Torselius Hall,"  :
                                         :

            Defendants.        :
                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S POST SUPPRESSION HEARING MEMORANDUM

 

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

Attorney for the United States
of America

THOMAS G. A. BROWN
WILLIAM J. STELLMACH
Assistant United States Attorneys

   - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA                                     :
                                                            :
            - v. -                                          :        07 Cr. 406 (RJS)
                                                            :
CLYDE W. HALL,                                              :
  a/k/a "Peter Hall," and                                   :
ANNE HALL,                                                  :
  a/k/a "Anne Torselius,"                                   :
  a/k/a "Anne Torselius Hall,"                              :
                                                            :
                    Defendants.                             :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## PRELIMINARY STATEMENT

The defendants assert that on January 9, 2007, law enforcement agents, while arresting them, improperly gained entry to their apartment at 270 Riverside Drive (the "Apartment") under the false pretext of possessing a search warrant, and then proceeded to conduct an illegal search to manufacture probable cause for a search warrant that the Government obtained later that same day. Notwithstanding a three-day hearing and the extensive briefing arising from the defendants' motion to suppress evidence seized during that search, few relevant facts are in dispute.

First, the defendants' assertion that agents engaged in misconduct to enter the Apartment by claiming to possess a search warrant is wrong on both the law and the facts. Notwithstanding Clyde Hall's protests that he would have surrendered in the

hallway, agents had a duty to enter the Apartment to arrest Anne Hall, who notably makes no claim that she would have surrendered in the hallway, and also to dress both Halls before removing them from their residence. In any event, three agents present at the time of entry clearly testified that no agent ever mentioned a search warrant to the defendants prior to, or even after, entry.

Second, once inside, agents were entitled to conduct a standard, protective security sweep of the Apartment. Because the premises occupied a single floor, agents were entitled to enter any room incident to that sweep, including the living room which was adjacent to the site of the defendants' arrests and in which a clipboard containing evidence of Clyde Hall's fraudulent conduct was seen in plain view. It is well-established that arresting agents are entitled to sweep any such adjacent locations. Moreover, even if agents were not, there was ample probable cause arising from the documents seen in plain view in the Apartment's office (which the defendants concede agents had a right to enter) to support a search warrant for the Apartment, rendering the clipboard inevitable discovery.

Third, as noted above, the clipboard in the living room and documents in the office were in plain view, and agents were in a lawful vantage to observe them. The testimony and photographic evidence adduced at the hearing showed that mail addressed to GIIT and other business documents were clearly visible in the office that Clyde Hall led agents to and where he maintained his wardrobe. Indeed, neither defendant has

disputed the agents' consistent testimony that the clipboard was laying in plain view on a table in the living room.

Finally, claims by members of the Hall family that agents "tossed" the Apartment following entry are completely misplaced. Far from rushing to seize evidence, agents were actually unable to execute any search due to a lack of supplies, manpower, and computer forensic expertise until that afternoon—after the search warrant was issued. Thus, even if a warrantless search did take place, then by the defendants' own account it resulted in the seizure of evidence that would have been seized pursuant to that warrant, squarely relegating any evidence seized prior to the warrant to the realm of inevitable discovery.

Accordingly, the Government respectfully submits that it has shown by a preponderance that there was no improper conduct by the agents and that the defendants' motion to suppress evidence seized during the search should be denied.

## RELEVANT FACTS

### A.    Prior Investigation

For at least the last six years, Clyde Hall had used his two prior residences as mailing addresses for various entities, including Grammercy International Investment Trust ("GIIT"), that were related to the Government's investigation. The Government also possessed evidence suggesting that Clyde Hall was using his current residence – the Apartment – for the same purpose because certain information, including bank statements

for an account held in the name of GIIT, were mailed to the Apartment. (Tr. 117 [Adler]; see also SW Aff., ¶ 35).[1]

On two or three occasions prior to January 7, 2007, Investigator Adler had discussed the possibility of obtaining a search warrant for the Apartment with the prosecutor. (Tr. 121 [Adler]). However, the Government chose to proceed only with the arrest warrants, and at the pre-operational meeting held shortly before January 7, Mr. Adler simply instructed other agents merely to be mindful of anything observed during the course of the arrest. (Tr. 10-11 [Adler]). There was no discussion about the need to develop probable cause while arresting the Halls to obtain a search warrant. (Tr. 11 [Adler]; 151-152 [Walker]; 312 [Gorra]).[2] In addition, the pre-operational plan prepared by the FBI also indicated that the only warrants were for "arrests," and mentioned nothing about a search warrant or the need to develop probable cause to obtain one.[3] (DX H).

---

[1]    "Tr." refers to the transcript of the suppression hearing held on June 13, July 1, and July 3, 2008, and the name in brackets denotes the witness whose testimony is cited: "Adler" is Jon Adler, a criminal investigator employed by the United States Attorney's Office; "Walker" is Postal Inspector John Walker; "Paliska" and "Gorra" refer to Special Agents Elvis Paliska and Madeline Gorra of the Internal Revenue Service's Criminal Investigation Division, respectively; "Patrick" refers to Carol Patrick; "Hall" refers to Lauren Hall; and "Assis" refers to Maria de Assis. "GX" and "DX" refer to Government and defense exhibits, respectively. "SW Aff." refers to the affidavit in support of the Government's application for a search warrant for the Apartment, 07 Mag. 0023, dated January 9, 2007; "C. Hall Aff.," "A. Hall Aff.," and "L. Hall Aff." refer to the affidavits submitted by Clyde Hall, Anne Hall, and Lauren Hall in support of the defendants' motion to suppress evidence, dated February 4, 2008.

[2]    Prior to January 7, Investigator Adler advised Agent Gorra of the possibility of a search being executed at the Apartment, and, pursuant to IRS procedure, she then obtained verbal authorization from her supervisor to participate in a search as well as the arrests. (Tr. 302-304 [Gorra]; GX 3504-F). As Agent Gorra explained: "it's better to get permission for an enforcement operation and not go on it than not get permission and at the last minute have to figure out what to do." (Tr. 304 [Gorra]).

[3]    Following the search, Agent Gorra was unable to obtain the FBI's pre-operational plan, which was an IRS administrative requirement to "close" her file. (Tr. 373-375 [Gorra]). At Gorra's request, Investigator Adler drafted an operational plan, essentially copying a version from another case and using

(continued...)

B.    **Entry into the Apartment**

Three agents present outside the Apartment's front door prior to entry testified at the hearing. All of them were federal law enforcement officers trained and experienced in the execution of arrest and search warrants. (Tr. 6-7 [Adler]; 148-150 [Walker]; 296-297 [Gorra]).[4]

The agents' testimony consistently refuted the defendant's allegations regarding the circumstances under which the agents entered the Apartment. A group of agents showed up at the front door at approximately 7 a.m., knocked repeatedly, and announced themselves; another group of agents was located at the side entrance. Mr. Hall then came to the door, and through the closed door, asked who the agents were. Investigator Adler responded that the agents were "police" and directed Hall to open the door. Each agent unequivocally testified that Hall never asked whether the agents had a search warrant, and no agent ever stated that there was a search warrant. (Tr. 17-19, 146 [Adler]; 155-156 [Walker]; 314-316 [Gorra]).

After Hall opened the door, the agents conducted a security sweep of the

---

[3](...continued)
his memory of what the FBI plan contained. (Tr. 510-514 [Adler]; GX 3501-A (the "Operational Plan")). While the Operational Plan was not post-dated or labeled a "pre-operational plan," the first page was written in the future tense, creating the potential mis-impression that it had been prepared prior to the search. However, Gorra explained that any potential confusion of her supervisors, for whom the Operational Plan had been prepared, was prevented because she had personally informed them about the circumstances and timing of its preparation. (Tr. 373 [Gorra]). During her testimony, Gorra identified the relevant supervisors whom she had notified about the Operational Plan, and the defendants did not seek to call any of those agents. Gorra's explanation therefore is unrefuted.

[4]    On May 19, 2008, the Government provided defense counsel with a list identifying every law enforcement officer who was present in the Apartment at any time on January 7, 2008, and the agents' respective agencies. (DX A). The defense did not call any agents to testify.

Apartment while Adler and Walker escorted Hall to the living room. While sitting on a

couch with Hall, Adler explained the arrest process and assured Hall that his children

would be cared for before the Halls were removed for processing. (Tr. 22-23 [Adler]).

Hall had answered the door wearing a bathrobe over his underwear (Tr. 64 [Adler]; 155

[Walker]; 315 [Gorra]), and Adler stated that Hall would need to get dressed; Hall then

said that his clothes were located in "my office," and, walking in front of the agents, led

Adler and Walker back toward the home office. (Tr. 22-23, 25-26, 68-69 [Adler]; 159-

160 [Walker]; see also C. Hall Aff., ¶ 6). Contrary to Hall's claims in his pre-hearing

affidavit, only those two agents accompanied him to his office.

Shortly after agents entered the Apartment, Anne Hall appeared in the

hallway leading from the master bedroom, walking back from the rear of the Apartment.

(Tr. 21 [Adler]; 158-159 [Walker]; 317-318 [Gorra]). She was dressed in a nightgown

and a bathrobe (Tr. 319 [Gorra]), and agents escorted her to the master bedroom so that

she could also dress.[5] While in the bedroom, agents opened drawers and removed clothes

only at Anne Hall's specific direction. (Tr. 319-321 [Gorra]). Asked why the agents did

not allow Hall to take out her own clothes, Agent Gorra explained that "once an

individual is in our custody, we don't let them roam freely regardless of where they are.

---

[5]      Clyde Hall's affidavit states that he and his wife went to the door "in our robes and nightclothes"
and never references his wife leaving the foyer, failing to explain why she was not present when he
opened the door. (C. Hall Aff., ¶ 2). While Anne Hall specifically states that they went to the door in
their nightclothes and she then returned to her bedroom to get her robe, her affidavit omits any
explanation for how she was able to listen to her husband's entire purported conversation with the agents
through the door, return to the master bedroom at the end of the hall, and then reappear shortly after the
door opened. (A. Hall Aff., ¶¶ 2, 4).

And we did a sweep for individuals of threat, not weapons that could be a threat." (Tr. 321 [Gorra]).

## C.    Agents Performed a Protective Security Sweep

The "sweep" to which Agent Gorra referred was a standard security sweep of the Apartment performed by agents immediately following entry. Among other things, the security sweep was a routine measure intended to ensure that everyone present in the Apartment was accounted for and to locate any potential threats. (Tr. 26-27 [Adler]); 157 [Walker]; 316 [Gorra]). The sweep itself consisted of agents walking through the Apartment and opening closets, but not drawers. (Tr. 34-35 [Adler]; 157-158 [Walker]; 321 [Gorra]). Questioned about the need to accompany the defendants after the sweep was executed, agents testified that they had never allowed an arrestee to freely roam in their home unaccompanied, in part because the sweep was not sufficient to locate weapons, only hidden individuals. (Tr. 26 [Adler]; 321 [Gorra]).

In their affidavits, the defendants claim that agents, in the course of performing the security sweep, actually searched the Apartment. For example, Clyde Hall asserts that agents searched through drawers and closets, reviewed files on his computer, and brought empty boxes into his office. (C. Hall Aff., ¶ 6). Anne Hall's affidavit echoes those claims: she contends that agents carried "flat unassembled boxes towards the office," one agent called for more boxes, and she saw full boxes carried out of the office. (A. Hall Aff., ¶ 6). Lauren Hall also testified that she observed agents remove two boxes before agents escorted her mother out of the Apartment. (Tr. 610-611 [Lauren Hall]).

The agents' testimony at the hearing, however, flatly contradicts those affidavits and that testimony.  Before the search warrant was delivered in the afternoon, agents did not even open drawers (except at Anne Hall's direction in the master bedroom), much less remove documents and pack boxes; indeed, agents never brought boxes into the Apartment while the defendants were present.  (Tr. 33-35 [Adler]; 158, 171-172 [Walker]; 320-321 [Gorra]).  Walking Anne Hall back to the master bedroom to get dressed, Agent Gorra looked into the office and did not see any boxes being packed or search executed, much less boxes carried out of the office.  (Tr. 319-320 [Gorra]).  Agent Paliska, who came to the Apartment to secure the premises with Agent Gorra after the other agents had taken the defendants for processing, also confirmed that when he arrived sometime  "after 10 a.m." nothing had been packed and there were no boxes in the Apartment.  (Tr. 221-222 [Paliska]).

Far from being poised to execute an illegal confirmatory search, the testimony was clear that agents had shown up at the Apartment unprepared for a search and only obtained boxes and other necessary supplies later in the afternoon, after confirming that a search warrant had been issued.  After learning that the search warrant had been issued, Agent Gorra telephoned another IRS agent, Glenn Daher, who brought the necessary boxes and supplies for a search; this took place in the afternoon—some hours after the defendants had been removed for processing.  (Tr. 222 [Paliska]; 334-335 [Gorra]).

Photographs taken at approximately 1:30 p.m., shortly before the search of the office, reflect that the office was still intact, and items later seized are clearly shown on the desk and shelves.[6]  (GX 3-A through 3-E).  For example, Agents Gorra and Paliska each testified that binders on the office's shelves and documents on the desk were seized, and those items are still in their original positions at the time that the entry set of photographs was taken.  (Tr. 228-229 [Paliska]; 340-342 [Gorra]).

Contrary to the defendants' claims, the testimony was also clear that no agent had gone onto the computer or printed any documents from it.[7]  (Tr. 35 [Adler]).  While securing the premises, Agent Gorra did telephone another IRS agent, Serge Kushner, who specialized in computer searches, but he did not arrive at the Apartment until around noon, and then waited with Gorra and Paliska in the living room until the search warrant was delivered.  (Tr. 42-44 [Adler]; 223-224 [Paliska]; 332 [Gorra]).  Even then, the computer search consisted of an electronic image or copy being made of the computer hard drive, and did not involve printing any files.  (Tr. 254-255 [Paliska]; 413-

---

[6]    During cross-examination of Investigator Adler, defense counsel suggested that the clock on the wall may have been broken and a clock on a shelf displayed a later start time of approximately 3:10 p.m. for the commencement of the search.  (Tr. 91-93 [Adler]; GX 3-D).  An inspection of the clock on the shelf, however, shows that its face is concave glass, distorting the actual time displayed.  Moreover, Agent Gorra testified that the times reflected in the clock on the wall were consistent with her own recollection of when the search began, how long it lasted, and when it ended.  Agent Paliska's testimony about the length of the search and approximate times corroborates Agent Gorra.  (Tr. 226 [Paliska]; 336-337 [Gorra]).

[7]    Another computer in the living room was not imaged.  Although the search warrant authorized the search of all computers in the Apartment, Anne Hall had informed Investigator Adler that the living room computer was used exclusively by the Hall children, and he felt that her representation, coupled with the fact that it did not appear to have been used for business purposes, suggested there was no nexus to the investigation.  (Tr. 49 [Adler]).

414 [Gorra]). Indeed, Agent Gorra specifically testified that she had never participated in

a search where documents were printed from a computer. (Tr. 341 [Gorra]).

## C.    Evidence in Plain View

There is no dispute that the items observed during the security sweep that

were referenced in the search warrant affidavit were in plain view.

While sitting on a couch in the living room explaining the arrest process to

Clyde Hall, Investigator Adler observed a clipboard with names associated with the

investigation laying on top of a nearby table. (GX 2; Tr. 23-24 [Adler]). Inspector

Walker, who was with Investigator Adler, also observed the clipboard in plain view on a

table in the living room. (Tr. 164-165 [Walker]). Neither Inspector Walker, Investigator

Adler, nor Agents Gorra and Paliska, who arrived later, touched the clipboard nor

observed anyone else do so until Lauren Hall wanted to obtain some telephone numbers

from it.[8] (Tr. 36-37, 47-48 [Adler]; 164-165 [Walker]; 222, 230-231 [Paliska]; 330-31

[Gorra]).

Likewise, Adler and Walker testified that, after Clyde Hall led them to his

office to dress, each observed (but did not touch) unopened mail addressed to GIIT laying

on his office desk.[9] (GX 3-E; Tr. 31-32 [Adler]; 161-163 [Walker]). Among other

---

[8]    Lauren Hall testified that she had not seen the clipboard in the living room when she first entered
the Apartment, and that Anne Hall told her the clipboard was in the office. Lauren Hall later admitted,
however, under questioning by the Court that she had not seen it in the office. (Tr. 605-606 [Hall]). In
fact, Lauren Hall admitted that she first saw the clipboard on a table in the living room. (Tr. 610 [Hall]).

[9]    Inspector Walker testified that, as Clyde Hall was dressing near the closets in the office, he was
standing approximately 5 to 6 feet away from the desk when he first saw the GIIT mail on top of the
desk. (Tr. 184-186 [Walker]).

business records in the office, there were also GIIT-related binders on shelves. (GX 3-D; Tr. 341-42, 382-383 [Gorra]). Again, none of the records in the office were touched, and those records remained in their original location until the search later that afternoon after the warrant had issued. (Tr. 228-229 [Paliska]; 341-342 [Gorra]).

After seeing that evidence, Adler waited until Clyde Hall was removed for processing and then telephoned the prosecutor, providing an update on the status of the arrests and explaining what he and Walker had observed with respect to the clipboard and mail in the office. (Tr. 36-37 [Adler]). Under questioning by the Court, Adler specifically stated that he had not returned to look at the items more closely and again testified that he had not seen any agents move or even touch the clipboard.[10] (Tr. 36-37 [Adler]).

**D.    Premises Secured**

After some of the agents removed Clyde Hall for processing, others remained in the Apartment with Anne Hall until the Hall children had been taken care of, or taken to school. Agents then removed Anne Hall, and Investigator Adler and Agent Gorra remained to secure the premises, pending issuance of a search warrant.[11] (Tr. 38

---

[10]    During cross-examination, defense counsel misunderstood Adler's earlier testimony, asking, "And you were reading from the clipboard when you reported to Mr. Brown, is that right?" (Tr. 112-113 [Adler]). But Adler was quite clear in his response and earlier testimony that he did not even touch the keyboard, at least until returning to the Apartment in the afternoon and discussing it with Lauren Hall, who had it in her possession.

[11]    While there were minor discrepancies between the agents' testimony regarding the precise time at which certain events happened, their testimony regarding the general time period and sequence of events was in accord.

[Adler]; 326 [Gorra]). No other agents remained on the premises, until Gorra called

Agent Paliska, who had not been involved in either the investigation or the arrests, to

replace Adler so that he could return to the U.S. Attorney's Office to complete an

affidavit in support of a search warrant. (Tr. 96-97 [Adler]; 218-219 [Paliska]). Between

the time that Anne Hall was taken for processing at approximately 9:30 a.m. and Adler's

return with the search warrant at around 1:30 p.m., there were never more than three

agents in the Apartment: (1) Gorra, who was present throughout the day; (2) Paliska, who

arrived at approximately 10 a.m.; and (3) Kushner, the computer forensic expert, who

arrived around noon.[12] (Tr. 219, 222-223, 226 [Paliska]; 326-335 [Gorra]).

Meanwhile, other members of the Hall family and their housekeeper had

arrived in the Apartment. (See, e.g., Tr. 46 [Adler]; 324 [Gorra]. Awaiting an update

regarding the status of the Government's application for a search warrant while securing

the Apartment, Agents Gorra and Paliska remained in the living room, watching TV and

occasionally getting up to make sure no one entered the office; however, neither agent

entered the office other than to show Agent Kushner the computer (which he did not

touch until after the warrant arrived). (Tr. 220-221 [Paliska]; 329, 332 [Gorra]). This is

in stark contrast to the testimony of the defense witnesses who testified about a constant,

---

[12]    Gorra spoke with Adler, who said that they needed a computer forensic expert; they had not
previously discussed that topic until that call. (Tr. 331-332 [Gorra]). Gorra then called Sergei Kushner,
an IRS agent experienced in computer forensics, who showed up around noon and waited in the living
room with Gorra and Paliska. (Id.)

ongoing search in which numerous boxes were removed by a large group of agents.[13]
(See, e.g., Tr. 426, 430 [Patrick]; 544, 545, 564 [Hall], 705, 715 [Assis]).   Indeed, Patrick
testified that agents removed the last boxes around 1:30 p.m., which, as described below,
is actually around the time that Adler returned with the search warrant and Agent Daher
arrived with boxes and supplies to begin the search.  (Tr. 433 [Patrick]).

      Contradicting Patrick, who testified that every half hour after she arrived
that she could see "two or three" agents conducting a search in the office, Lauren Hall
testified that agents kept the office door closed.  (Tr. 482 [Patrick]; 591-592 [Hall]).
Lauren Hall also testified that an agent named "John" was present until approximately
noon and confessed to her that while agents had a "warrant" for the "residence" they still
needed one for the office, notwithstanding the fact that no one had told her to leave the
Apartment and she had been allowed to witness this purportedly unlawful search.  (Tr.
567, 569, 623-624 [Hall]).

      Regarding the clipboard, Gorra testified that Adler pointed it out to her
before he left, and she in turn pointed it out to Paliska; neither Gorra nor Paliska touched
the clipboard until Paliska handed it to Lauren Hall, who stated that she needed it to make
calls.  (Tr. 230-231 [Paliska]; 330-331 [Gorra]).  Gorra informed Lauren Hall that she
could have the clipboard, but could not take it out of the agents' sight.  (Tr. 331 [Gorra]).
Lauren Hall testified that she first saw the clipboard laying on a table in the living room,
which is also where Adler, Walker, Gorra, and Paliska each testified (as cited above) that

---

[13]     Coincidentally, the only agents Lauren Hall could physically identify were Gorra and Paliska,
who testified at the hearing, and who she saw while waiting to testify herself.  (Tr. 553-554 [Hall]).

it had remained from the time each first saw it. (Tr. 551-552 [Hall]). According to Hall's own testimony, no agent attempted to take the clipboard from her, but after she had it for "about an hour," an agent informed her that someone would have to remain with the her to "guard" the clipboard. (Tr. 571, 609-610 [Hall]). In addition, no agent prevented Lauren Hall or Patrick from going into any room, other than the office (and, according to Hall and Assis, the master bedroom), or told them to leave. (Tr. 431, 453 [Patrick]; 609-610 [Hall]; 711 [Assis]).

**E.     The Search Warrant**

While Agents Gorra and Paliska secured the premises, Investigator Adler had returned to the U.S. Attorney's Office where he worked with the prosecutor to complete the search warrant affidavit, which had been partially drafted prior to that day. Adler testified, however, that the search warrant affidavit was not "in the can" and involved more work than inserting a few paragraphs. (Tr. 132 [Adler]).

**F.     The Search**

After the Honorable Debra Freeman, a United States Magistrate Judge in the Southern District of New York, issued the Apartment search warrant at 1 p.m. that afternoon (GX 4, 4-B), Investigator Adler telephoned Agent Gorra to inform her and then returned to the Apartment at approximately 1:30 p.m.[14] (Tr. 42, 46 [Adler]; 333-335

---

[14]    Adler testified that he returned with the warrant around at "approximately 2 p.m." (Tr. 29-30, 97 [Adler]), but Gorra and Paliska were more precise that Adler arrived before the search began. Photographs taken by Agent Kushner of the office immediately before the search reveal a clock reading approximately 1:30, which was also consistent with Gorra and Paliska's own independent recollections of when the search was executed. (GX 3-A; Tr. 225-227 [Paliska]; 335-337 [Gorra]). Both agents were clear that no search began before Adler delivered the warrant to them, and Agent Daher arrived with necessary boxes and supplies.

[Gorra]).  Following Investigator Adler's call, Agent Gorra asked Lauren Hall whether the search could commence, but Hall stated that she wanted the agents to wait until the warrant was delivered, and the agents complied with that request.  (Tr. 224-225 [Paliska]; 333-336 [Gorra]).  As Agent Gorra testified: "I had asked permission, and I don't even know why I asked her permission, to start with imaging the computers since that was the longest of the process.  She requested that we wait till the warrant showed up.  And we obliged that – that request."  (Tr. 336 [Gorra]).  The search of the office itself could not proceed because the agents securing the premises lacked necessary supplies, and wanted to understand the scope of what they were authorized to seize.  (Tr. 225-226 [Paliska]; 335-336 [Gorra]).  The agents also lacked sufficient manpower: "we weren't used to being short-staffed on search warrants so normally we have two people searching together and the computer person would have been busy with the computer so we had no one actually to handle the residents in the residence."[15]  (Tr. 226 [Paliska]).  In sum, even if the agents wished to proceed with seizing documents, they were unable to do so.

Upon arrival, Adler delivered a copy of the search warrant to Gorra and Paliska, who reviewed it and the attached rider before proceeding with the search.  (Tr. 227 [Paliska]; 337-338 [Gorra]).  He also gave another copy to Lauren Hall, and discussed it with her and Carol Patrick.[16]  (Tr. 48 [Adler]; 338 [Gorra]).  Questioned by

---

[15]     When Adler returned, he also noticed that no boxes had been packed.  (Tr. 47 [Adler]).

[16]     In addition to explaining the search warrant and arrest process, Adler also discussed the clipboard with Lauren Hall, explaining that she could not remove it but that she could use it or make a copy.  (Tr. 47-48 [Adler]; 230 [Paliska]).

Lauren Hall about whether agents would steal her father's things, Adler advised her that anyone on the premises was "welcome" to stay and to observe the search (Tr. 48 [Adler]), and for the majority of the time Hall, Patrick, or Assis watched the agents in the office from the open doorway. (Tr. 48 [Adler]; 342 [Gorra]). Indeed, although Lauren Hall testified that the door was closed throughout the search (Tr. 591-592 [Hall]) – a point not mentioned in her affidavit and contradicted by every other Government and defense witness (Tr. 431 [Patrick]; 705, 714-715, 722 [Assis]) – no defense witness claimed that agents ever directed them to leave.

Shortly after Adler returned, Agent Daher arrived with boxes and supplies so that Gorra and Paliska could execute the search; Daher then left. (Tr. 334-335 [Gorra]). Immediately before and after the search, Agent Kushner took photographs of the scene. (GX 3-A and 3-F, showing times of approximately 1:25 p.m. and approximately 5:15 p.m., respectively). In addition to showing evidence in plain view on the desk, as Adler and Walker testified, those photographs also establish that at the time of entry into the office there were no boxes present, packed or otherwise, and that numerous records and documents ultimately seized were in their original location. (GX 3-A – 3-E; Tr. 228-229 [Paliska]; 341-342 [Gorra]). The search of the office took approximately an hour, but imaging the office computer required several hours. (Tr. 50 [Adler]; 256-257 [Paliska]; 337-339 [Gorra]). Altogether, agents seized four boxes of documents in addition to imaging the computer hard drive. (GX 3504-A – 3504-D).

In addition to searching the office, agents performed a "cursory visual search" of the rest of the Apartment (Tr. 49 [Adler]), which consisted of walking through the other rooms to see if anything else should be seized, and which Gorra specifically stated was "not a true search." (Tr. 340 [Gorra]). Although the search warrant encompassed the entire Apartment (GX 4-B), agents determined that there was nothing related to their investigation outside the office other than the clipboard, and, recalling Anne Hall's representation that the living room computer was not business related, did not image that computer. In brief, no rooms were searched other than the office, and the clipboard was the only item seized from outside the office. (Tr. 49-50 [Adler]; 231-232 [Paliska]; 341-344 [Gorra]).

## DISCUSSION

### The Defendants' Motion to Suppress Should Be Denied

No agent engaged in any misconduct either in entering the Apartment or in the security sweep conducted following their entry that resulted in the discovery of evidence in plain view. The evidence adduced at the suppression hearing clearly showed that the defendants' claims regarding an illegal search were similarly unfounded. Accordingly, the defendant's motion to suppress should be denied.

**A.    Agents Properly Entered the Apartment**

**1.    Agents Were Entitled to Enter the Apartment**

The lynchpin of the defendants' motion is their claim that agents lied to gain entry into the Apartment. See C. Hall Aff., ¶¶ 2-3; A. Hall Aff., ¶ 3. Absent that

-17-

false assertion, Clyde Hall maintains that he would have surrendered immediately in the hallway, obviating any need for the agents to enter the Apartment.  See C. Hall Aff., ¶ 4.

As a threshold matter, the defendants concede that agents were entitled to enter the Apartment to dress them: "[B]ecause Mr. Hall needed to dress, the agents were authorized—as they did—to escort Mr. Hall to his closet."  Def. Mot., at 10.  At the time of arrest, which took place in the middle of winter, neither defendant was dressed: Clyde Hall answered the door wearing a bathrobe over his underwear (Tr. 64 [Adler]; 155 [Walker]; 315 [Gorra]), and Anne Hall was wearing a nightgown and a bathrobe (Tr. 319 [Gorra]).[17]  When speaking with Clyde Hall in the living room, Adler asked where his clothes were, and Hall indicated that they were in his office, to which he led Adler and Walker.  At no point did either defendant suggest that they did not need to dress, or that they were prepared to leave the Apartment dressed in their pajamas.

The Second Circuit has long recognized that an arresting officer has a duty to ensure that an arrestee is sufficiently dressed before removing them from their residence.  United States v. Di Stefano, 555 F.2d 1094, 1101 (2d Cir. 1997) (defendant wearing a nightgown and bathrobe had to be properly dressed).  In the fulfilment of that duty, arresting officers may accompany an arrestee into the residence (or another part thereof) "to maintain a 'watchful eye' on her and to assure that she did not destroy evidence or procure a weapon."  Id.; see also Washington v. Chrisman, 455 U.S. 1, 6

---

[17]    There was a slight difference between the agents regarding Clyde Hall's attire: Agent Gorra recalled that he was wearing pajama bottoms and a T-shirt while Inspector Walker testified to Hall wearing underwear.  (Tr. 155 [Walker]; 315 [Gorra]).

(1982) ("The officer had a right to remain literally at [the arrestee's] elbow at all times...."); United States v. Rudaj, 390 F.Supp.2d 395, 402 (S.D.N.Y. 2005) (Cote, J.) ("arresting agents had a duty to provide clothing for [the defendant] and a right to be in the bedroom to fulfill that duty"). Alternatively, the officers may choose to keep arrestees in a secure location and send an agent to get the necessary clothing. See Di Stefano, 555 F.2d at 1101; United States v. Titus, 445 F.2d 577, 578-79 (2d Cir. 1971); see also United States v. Gwinn, 219 F.3d 326, 333 (4th Cir. 2000) ("[T]he arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant."). If anything, allowing the Halls to dress themselves was less intrusive than agents isolating them and then seeking clothing in the Apartment.

Even if agents were inclined to disregard their duty to dress Clyde Hall sufficiently before removing him from his residence, they still needed to arrest Anne Hall. Unlike her husband, Anne Hall notably never asserted in her affidavit that she would have surrendered in the hallway absent the purported false claim about a search warrant. Since agents still needed to arrest her, they would have needed to enter and remain in the Apartment until the Hall children and a small menagerie, (Tr. 76 [Adler]), were properly taken care of. See, e.g., Payton v. New York, 445 U.S. 573, 602-03 (1980) (law enforcement officers may enter a suspect's residence to arrest him or her if they have a valid arrest warrant); United States v. Lauter, 57 F.3d 212, 214 (2d Cir. 1995) ("Agents may enter a suspect's residence, or what they have reason to believe is his residence, in

-19-

order to effectuate an arrest warrant where a reasonable belief exists that the suspect is

present."). Indeed, the testimony showed that the Halls had three minor children asleep

in the Apartment, and that Anne Hall in any event would have needed to take medication

for her diabetes—either fact would have required her to return to the Apartment,

precipitating a security sweep of the premises.

Thus, whatever agents said to Clyde Hall prior to entering the Apartment is

irrelevant in light of their right to enter it, which even the defendants concede.

### 2.   Agents Did Not Purport to Possess a Search Warrant Prior to Entry

In any event, the record is equally clear that no agent made any false

statement regarding a search warrant to the defendants or anyone else either before or

after entering the Apartment. Three different agents who had stood outside the

Apartment's front door before Clyde Hall opened it testified at the hearing. Each of them

unequivocally denied that they heard Mr. Hall ask about a search warrant, or that any law

enforcement officer stated that there was a search warrant. (Tr. 17-19, 146 [Adler]; 155-

156 [Walker]; 314-316 [Gorra]). Investigator Adler testified that Hall "absolutely" did

not ask about any search warrant, and Agent Gorra testified that she could testify

definitively that no one had entered under false pretenses, notwithstanding the passage of

time, "[b]ecause I knew we didn't have a search warrant and if I would have heard people

talking that we had it, I would have questioned it right away." (Tr. 146 [Adler]; 345

[Gorra]). Mr. Hall only inquired about the agents' identity, and Adler simply responded

that the agents were "police" with arrest warrants.

The only contradictory evidence on this point consists of the defendants' own affidavits, which contain several material omissions and inconsistencies. For example, although Clyde Hall was so concerned about whether agents possessed a search warrant in addition to arrest warrants that he asked about it before opening the door, he never asked to see the search warrant, either before or after opening the door. The agents testified that he never made any such request, and his own affidavit does not reflect that he did. Furthermore, the fact that, woken at 7 a.m., he had the presence of mind to ask about search warrant and formulate intent to surrender in hallway absent such a warrant strains credulity.

In addition, the Halls' affidavits contradict each other on what Anne Hall was wearing at the time they both claim to have answered the front door, raising a question about whether she actually was even present to overhear any conversation between her husband and agents at the door, as she claims she did. (A. Hall Aff., ¶¶ 2-3). Both the agents and Anne Hall in her affidavit acknowledge that she was not at the door when the agents entered. (A. Hall Aff., ¶ 4 ("I started back to our bedroom to put on a robe.")). Clyde Hall, however, asserted that he and his wife both put on their robes before going to the door, which does not explain why Anne Hall was not standing at the door with him. (C. Hall Aff., ¶ 2). If Anne Hall had been standing at the door and witnessed her husband's conversations about a search warrant, then why did she return to her bedroom? On the other hand, if Anne Hall did overhear any conversation, how was she

able to get back to her bedroom, located at the opposite end of the Apartment, and then return within seconds of the door opening?

Against these affidavits, the Government offered the testimony of three agents who testified consistently regarding the circumstances under which they made entry. Indeed, the Government notes that, nearly a month before the hearing began, it provided the defendants with a list of all the agents present at the Apartment on January 7, 2008, as well as contact information. (DX A). The defendants chose not to call any of those witnesses, and offered no testimony from anyone present at the time of entry.

Based on this record, the Government submits that it is clear that no agent engaged in any misconduct to gain entry into the Apartment.

**B.      Agents Properly Conducted a Security Sweep of the Entire Apartment**

Clyde Hall contends that agents were only authorized to arrest him in the foyer and then escort him back to his office to dress. "In the march from foyer to office, there is no need to enter any other rooms." (Def. Mot., 10). A review of the floor plan confirms that fact. (GX 1). Hall therefore argues that the security sweep of the living room was overly broad because it strayed beyond his immediate vicinity, and the clipboard—which he does not dispute was in plain view—was then seen. Hall's argument is predicated on the fundamental misassumption that agents could not leave his presence and that he controlled the circumstances of arrest.

Even if the sweep was overly broad, however, the clipboard was inevitable discovery. Significantly, Hall concedes the legality of the sweep of his office. (Id.)

("[A]gents were authorized—as they did—to escort Mr. Hall to his closet."). Standing

alone, the evidence that Adler and Walker viewed in the office would have sufficed to

provide probable cause to search the Apartment, and would have resulted in the discovery

of the clipboard laying on top of a table in the living room.

     1.    **<u>Agents Were Entitled to Sweep the Apartment</u>**

        a.    **<u>Applicable Law Regarding Security Sweeps</u>**

       Hall's claim that agents could not leave the foyer and were restricted solely

to escorting him to dress in his office is simply wrong. The Fourth Amendment standard

for protective sweeps conducted in the course of an arrest was laid out by the Supreme

Court in <u>Maryland</u> v. <u>Buie</u>, 494 U.S. 325, (1990). The Court held that "as an incident to

the arrest," officers may "look in closets and other spaces immediately adjoining the place

of arrest from which an attack could immediately be launched." <u>Id.</u> at 334. This limited

sweep may be conducted "as a precautionary matter and without probable cause or

reasonable suspicion." <u>Id.</u> If the officers wish to undertake a more wide-ranging sweep,

however, "there must be articulable facts which, taken together with the rational

inferences from those facts, would warrant a reasonably prudent officer in believing that

the area to be swept harbors an individual posing a danger to those on the arrest scene."

<u>Id.</u> "[G]eneralizations, without more, are insufficient to justify a protective sweep."

<u>United States</u> v. <u>Moran Vargas</u>, 376 F.3d 112, 116 (2d Cir.2004). So too is a lack of

information. <u>Id.</u> at 117. Moreover, "[t]he justification for a protective sweep is

ephemeral: it may last no longer than is necessary to dispel the reasonable suspicion of

danger and in any event no longer than it takes to complete the arrest and depart the premises." Moran Vargas, 376 F.3d at 115 (citation omitted).

Yet even "if justified by the circumstances," a protective sweep is "aimed at protecting the arresting officers," Buie, 494 U.S. at 335, 110 S. Ct. 1093, not gathering evidence. It is therefore "not a full search of the premises, [and] may extend only to a cursory inspection of those spaces where a person may be found." Id. Nevertheless, "[p]atently incriminating evidence that is in plain view during a proper security check may be seized without a warrant." Kiyuyung, 171 F.3d at 83.

**b.    The Living Room Was Properly Swept**

Under these standards, the agents' viewing of the clipboard was entirely proper as part of a protective sweep incident to arrest.[18]  A review of the floor plan (GX 1) confirms that the living room was adjacent to the foyer where Clyde Hall was arrested, as well as the hallway where Anne Hall was arrested.  The living room clearly was "immediately adjoining the place of arrest," and therefore fell squarely within the first category of permissible areas for sweeps recognized in Buie.

**2.    The Clipboard Was Inevitable Discovery**

**a.    Applicable Law Regarding Inevitable Discovery Doctrine**

The doctrine of inevitable discovery provides that "evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the

---

[18]    Contrary to Hall's claims, there was no "search" of the clipboard. See Def. Mot., 10. Agents simply saw it on top of a table in the living room and left it there. Aside from Agent Paliska handing the clipboard to Lauren Hall, at her request, all four agents testified that they did not review or even touch the clipboard. (Tr. 23-24 [Adler]; 164-165 [Walker]; 230-231 [Paliska]; 330-331 [Gorra]). Indeed, the search warrant affidavit only references visible on its first page. (GX 4-B, ¶ 37).

government can prove that the evidence would have been obtained inevitably' without the constitutional violation." United States v. Heath, 455 F.3d 52, 55 (2d Cir.2006) (citing Nix v. Williams, 467 U.S. 431, 447 (1984)). "In essence, the inevitable discovery doctrine's application turns on a central question: Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation? If the answer is 'yes,' the evidence seized will not be excluded." Id.; see also United States v. Mendez, 315 F.3d 132, 137 (2d Cir.2002).

Thus, illegally-obtained evidence is admissible where the Court can find "with a high degree of confidence ... that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." Heath, 455 F.3d at 60. The Government bears the burden of proving by a preponderance of the evidence that discovery of the challenged items "would inevitably have happened," id. at 58 n. 6 (citing United States v. Cabassa, 62 F.3d 470, 474 (2d Cir.1995)), by pointing to "demonstrated historical facts capable of ready verification or impeachment," United States v. Eng, 971 F.2d 854, 859 (2d Cir.1992) ("[P]roof of inevitable discovery 'involves no speculative elements ....' ") (quoting Nix, 467 U.S. at 444 n. 5) (emphasis in original).

**b.     There Was Ample Probable Cause Independent of the Clipboard**

Because agents were required to dress the defendants properly before removing them from their residence, they were fully entitled to escort Clyde Hall to dress in his office, which he led them to down the hallway from the living room. The unopened

GIIT mail on the desk, the glass-fronted cabinet containing records, and the shelves with GIIT binders and other business records – all of which were indisputably in plain sight – was sufficient basis for probable cause to search the Apartment. (GX 4-B, ¶ 36; GX 3-A – 3-D). The resulting search would have yielded the clipboard, which was laying in plain view.

## C.    Evidence Was in Plain View

Because the agents were lawfully in the living room and office, the next issue is whether their sweep and escorting of the defendants was overly broad. In other words, did agents go beyond the limits of what they were authorized to do? Here, it is undisputed by anyone present at the time of entry that the items referenced in the search warrant affidavit were in plain view.

First, the photographs taken of the office clearly show documents both on the desk and shelves that were business-related. Those photographs were taken at approximately 1:25 p.m. that afternoon (GX 3-A), and show that nothing had been moved, much less packed, in that office. Adler and Walker testified that, after Clyde Hall led them to his office to dress, each observed (but did not touch) unopened mail addressed to GIIT laying on his office desk. (GX 3-E; Tr. 31-32 [Adler]; 161-163 [Walker]). Inspector Walker specifically testified that, as Hall was dressing near the closets, he saw the mail on top of the desk while standing approximately 5 to 6 feet away from the desk. (Tr. 184-186 [Walker]). Among other business records in the office, there were also GIIT-related binders on shelves. (GX 3-D; Tr. 382-383 [Gorra]). Again, none of the

records in the office were touched, and those records remained in their original location
until the search later that afternoon after the warrant had issued. (Tr. 228-229 [Paliska];
341-342 [Gorra]).

Second, no has disputed that the clipboard was in plain view in the living
room, other than Lauren Hall, who was not present at the time of entry. See supra p. 10,
n. 8. Significantly, neither defendant has ever claimed that the clipboard was in another
location, much less out of sight, than that identified in the search warrant affidavit.

Agents were in a lawful vantage point to observe the clipboard and the
documentary evidence in the office, and their cursory viewing (which did not even
involve touching items) in no way overstepped their authority. See, e.g., United States v.
Ochs, 595 F.2d 1247, 1257 n.8 (2d Cir. 1979) (holding that the seizure of documents in
"plain view" is not improper, notwithstanding the fact that some perusal is needed for the
seizing agents to perceive the relevance of the documents to crime.); United States v.
Diecidue, 603 F.2d 535, 59 (5th Cir. 1979) (noting that "seizure of address books in plain
view [is] valid even though the officer first paged through them because the officer had
'recognized that the address books might be of significance before he leafed through
them").

**D.    No Evidence Should be Suppressed on the Basis of Any Warrantless Search**

Finally, the defendants' claims regarding a warrantless search should be
rejected. No such search took place (or even could have taken place given the lack of

preparation), but even if one had, it would merely have resulted in the seizure of evidence that was classic inevitable discovery.

1.    **There Was No Warrantless Search**

a.    **Evidence Clear Agents Did Not Search Until Warrant Issued**

Far from rampaging through the Apartment, as the defendants claim, the evidence adduced at the hearing was clear that agents did not begin the search until after Investigator Adler returned with the search warrant that afternoon. Indeed, agents took take not even to touch, much less review, the clipboard or documents in the office. While there was an initial protective security sweep, it did not amount to anything more invasive than opening a few closets and walking through some of the rooms in the Apartment. Before the search warrant was delivered in the afternoon, agents did not even open drawers (except at Anne Hall's direction in the master bedroom), much less remove documents and pack boxes; indeed, agents never brought boxes into the Apartment while the defendants were present. (Tr. 33-35 [Adler]; 158, 171-172 [Walker]; 320-321 [Gorra]).

No search therefore was even possible until after the defendants left the Apartment because agents lacked necessary supplies, including boxes, and computer forensic expertise. Until Agent Kushner arrived at noon and Agent Daher brought over boxes at around approximately 1:30 p.m., the two agents securing the Apartment waited

in the living room, watching television.[19]  (Tr. 222 [Paliska]; 334-335 [Gorra]).

Photographs taken prior to the search of the office clearly show documents and business

records still in place at approximately 1:25 p.m.  (GX 3-A - 3-D).  From the time that

Clyde Hall escorted led agents to his office until those photographs, nothing had been

touched in that office.  (Tr. 228-229 [Paliska]; 340-342 [Gorra]).  Indeed, agents accepted

Anne Hall's representation that the living room computer contained no relevant

information at face value, and did not attempt to image or to access it.  (Tr. 49 [Adler]).

        The defendants' claims that agents also attempted to print files from the

office computer is belied by investigative practice and the agents' experience.  Agent

Gorra specifically testified that she had never participated in a search of a computer

where files were printed, and here the evidence is clear that the search method consisted

solely of making an electronic copy of the computer hard drive.  (Tr. 254-255 [Paliska];

341, 413-414 [Gorra]).

        If anything, agents were respectful and even deferential to the Halls.

Agents actually asked Lauren Hall's permission to start imaging the office computer once

Adler telephoned to inform them that a search warrant had issued, and then waited after

she refused permission until the warrant was delivered.  (Tr. 336 [Gorra]).

---

[19]      Agent Gorra did not even telephone Kushner and ask him to come to the Apartment until Adler requested that she arrange for a forensic search of the office computer.  (Tr. 42-44 [Adler]; 223-224 [Paliska]; 332 [Gorra]).

In brief, the Government submits that the record is overwhelming that no agent began a search of the Apartment until the search warrant was actually issued <u>and</u> delivered to the agents securing the premises.

### b.    Defense Witnesses' Claims of a Warrantless Search Lack Credibility

The defendants, who chose not to testify, called three witnesses: Carol Patrick, Clyde Hall's sister; Lauren Hall, his daughter; and Maria de Assis, a long-time nanny for the Halls and "a really close family friend." (Tr. 551 [Hall]). During their direct testimony, Patrick, Lauren Hall and Assis each claimed with varying degrees of detail that law enforcement agents engaged in a wholesale search of the Apartment, seizing boxes of documents which they removed from the apartment and viewing files on a computer in Clyde Hall's office, all before the search warrant in this case was issued at 1 p.m. (Tr. 426, 430-31, 432 [Patrick]; 544, 558-61, 591-92 [Hall]; 705, 715, 722 [Assis]). Each witness's version of events, however, does not support the defendants' claim of a warrantless search, especially when viewed in light of the Government's evidence, <u>supra</u>.

### i.    Carol Patrick

Carol Patrick testified that she rushed from her residence in Ft. Lee, New Jersey to the Apartment on Manhattan's Upper West Side after receiving a call from Lauren Hall at around 7 a.m. Patrick claimed she made the trip in about 45 minutes and arrived no later than 11 a.m. (Tr. 418-19, 496). Once there, Patrick testified that she saw agents primarily searching the Apartment's office, looking through drawers and files, searching a computer, and removing 4 boxes of material. (Tr. 427-33). According to

Patrick, this activity went on for about two hours, from the time she arrived at about

11:00 a.m., until around 1:30, when the activity dropped off dramatically.  (Tr. 432-33).

From about 1:30 to 3 p.m., when Patrick testified she left the apartment to attend to Clyde

Hall's bail, the agents were just "milling around" and "cooling their heels."  (Tr. 432).

      Although Patrick's recollection of the _timing_ of the search differs from that

of the agents, her testimony about the _sequence_ of events in fact corroborates the

Government's evidence at the hearing.  First, Patrick testified that she rode an elevator to

the Apartment with an "FBI agent," whom she identified in court as Investigator Adler.

(Tr. 419, 494).  This event could not have occurred at 11 a.m., as Patrick claims, but

rather at around 1:30 p.m., when Adler returned with the search warrant.   Investigator

Alder, Agent Gorra, and Agent Paliska all testified that Adler left the Apartment between

9:30 a.m. and 10:30 a.m., to obtain the search warrant, (Tr. 33, 36 [Adler], 219 [Paliska];

329 [Gorra]), and that he returned with it at around 1:30 p.m. or 2:00 p.m. (Tr. 29-30, 97

[Adler]; 226 [Paliska]; 336 (Gorra).  Accordingly, he was not at the apartment at 11:00, as

Patrick asserted.

      Second, Patrick testified that the search of the office went on for about two

hours, with an approximately two hour lull until she left at around 3 p.m.  (Tr. 427, 429-

32).  Patrick testified that she and Lauren Hall monitored the agents' progress, and that

Lauren Hall spoke to Investigator Adler about the search.  (Tr. 424-31).  This comports

with the agents' testimony that (1) the entire search took about four hours, from about

1:30 p.m. to about 5:30 p.m.; (2) the search of the office in particular took about an hour

or so, with the rest of the time being spent waiting for the office computer's hard drive to be copied, (Tr. 50 [Adler]; 231 [Pakiska]; 339 [Gorra]); (3) Adler spoke to Hall about the search process after the warrant was issued, (Tr. 46-48 [Adler]; 227 [Paliska]; 338 [Gorra ]); and (4) Hall and Patrick stood outside the office door watching the agents conduct the search (Tr. 48 [Adler]; 342 [Gorra]).

       The time-shift between Patrick's version of events and the agents' testimony can be explained by Patrick's bias and confusion. As Clyde Hall's sister, Patrick has an obvious interest in the outcome of the suppression hearing. Further, she made no secret of her aversion to the Government, describing the agents' behavior as "overtly intimidating" (Tr. 422),[20] and contending that the defendants' arrest had placed her family under great stress (Tr. 447, 448). At the same time, it was apparent from her testimony that Patrick's recollection was unreliable. For example, she stated that she had not discussed the subject matter of her testimony with anyone since the defendants' arrest 18 months earlier. (Tr. 443-48, 492-94). Moreover, Patrick testified that the defendants' arrest was a nerve-wracking event that still causes her "a great deal of stress and anxiety." (Tr. 494). Given that Patrick (1) was under stress both at the time she observed the search of the Apartment, as well as during her testimony, (2) she had not done anything to refresh her recollection since the search occurred many months ago, and (3) she was clearly biased, it is reasonable to conclude that she conflated the time at which she saw

---

[20]    When pressed on cross, however, Patrick couldn't explain how the agents were intimidating beyond the fact that one agent spoke in a "very authoritative" voice. (Tr. 473-75).

the agents conduct the search, thinking it happened before rather than after the search warrant was issued.

### ii.   Lauren Hall

Lauren Hall's testimony suffers from similar infirmities. First, like Patrick, Hall has a strong familial bias in favor of the defendants, (Tr. 626-27), and an extremely unfavorable view of the Government. She viewed as frightening the agents' attempts to arrange for a younger sibling to go to school and perceived the search to be an outrageous invasion of privacy. (Tr. 48, 541, 558, 645).

Second, although she confidently asserted in her affidavit and during her direct testimony that the search happened before a warrant was issued, Hall became much more vague about the timing when pressed on cross examination. (Tr. 613 ("I can recall the events better than the time. The exact time, no, but that is the best I can remember.")). Moreover, Hall admitted destroying key evidence that would have provided an accurate, contemporaneous record of when the search actually occurred. Hall testified that she wrote down events as they happened during the search, carefully noting the time, because she felt the information would be important when she consulted with an attorney later that day. (Tr. 556, 573, 637-39). Hall claimed, however, that even though she thought the search was wrong, she didn't think her notes would be helpful later on, even after talking to a lawyer. (Tr. 644-45). It may be reasonably inferred from Halls decision to throw away her notes that they did not support, or even contradicted, the defendants' claims of a

warrantless search.  At the very least, her actions speak volumes about her lack of

reliability as a witness.

With respect to her sworn affidavit, Hall conceded that it included

information about which she was only "fairly certain," (Tr. 594-95).  The suspect nature

of her affidavit became increasingly clear during her testimony, when she contradicted

key portions of it and added material facts.  For example, although she never mentioned it

in her affidavit, Hall claimed at the hearing that she saw agents deliver flat boxes to the

apartment when she first arrived (mirroring Anne Hall's affidavit).  (Tr. 600-601; A. Hall

Aff., ¶ 6).  Hall also testified that she was 100% certain that an agent told her that the

Government had a "warrant," rather than a "search warrant," for the "residence," (Tr. 624-

25), in contrast to her affidavit, in which she asserted she was told that law enforcement

had a "search warrant" for the "house" (L. Hall Aff., ¶ 2).  In addition, Hall contradicted

her affidavit when she testified that she could see the Apartment's address on the search

warrant.  (Tr. 628-30; L. Hall Aff., ¶ 8).   Despite these glaring inconsistencies, Hall

refused the Government's and the Court's invitation to review her affidavit for any other

errors, claiming that it was correct.  (Tr. 630).   In light of the foregoing, Lauren Hall

cannot be considered a reliable witness.

### iii.    Nina de Assis

As with Patrick and Hall, Assis acknowledged a strong partiality for the

defendants and their family, testifying that she had helped raise Lauren Hall and her

siblings 20 years ago, was currently a nanny to Lauren Hall's child, and also currently

helped raise the defendants' youngest children. (Tr. 696, 738). Assis testified that she "love[d] the whole family," including Clyde Hall and Anne Hall, and described Lauren Hall as "like my granddaughter." (Tr. 736-37).

Despite her strong affinity to the defendants, Assis's testimony was generally vague about the timing of the agents' search, so much so that defense counsel took the extraordinary step of meeting privately with her while she was still on direct examination to urge her to try and recall specific times. On cross examination, Assis further undermined her credibility by admitting that she sublet a rent-controlled apartment from Lauren Hall's mother, who subsidized Assis's rent. (725-27) In addition, while offering only vague details about her income, (Tr. 743, 750-51), Assis claimed that the defendants did not pay her for her current child care work. (Tr. 703-04, 738). Shown a check dated May 7, 2006 drawn on a GIIT bank account and made out to her for "home services," Assis insisted that it was Mothers Day present and not a payment. (Tr. 738-39; GX 101). Assis also claimed that she could not recall whether she lived in an apartment on West End Avenue in Manhattan in 2002, despite admitting that she had signed a letter, dated 28, 2002, acknowledging that she was subletting from Clyde Hall a $5,000 per month apartment at 451 West End Avenue. (Tr. 743, 747; GX 100). Assis's inherent bias, lack of specifics concerning the search, and less-than-credible responses on cross examination belie her testimony in support of the defendants motion.

In sum, none of the defendants' witnesses, alone or together, offer a credible alternative to the Government's evidence that no warrantless search took place.

### 2. **Anything Seized Prior to the Search Warrant Was Inevitable Discovery**

Assuming that a warrantless search took place (and that the items taken did not qualify for seizure under the plain view doctrine), any documents or items seized would fall clearly into the realm of inevitable discovery. Based on items in plain view observed from a lawful vantage in both the living room and the office, Investigator Adler telephoned the prosecutor, described what he and Inspector Walker had seen with respect to the clipboard and documents in the office, and then returned to the U.S. Attorney's Office to complete the search warrant application. Anything that agents might have then seized from the office therefore was ultimately within the scope of the search warrant, which was based on independent probable cause.

Thus, any warrantless seizure merely would have resulted in agents seizing evidence to which they were entitled under the warrant, which was predicated on evidence in plain view.

## **CONCLUSION**

For the foregoing reasons, the defendants' motion to suppress should be denied.

Dated:      New York, New York
            August 22, 2008


                          Respectfully submitted,

                          MICHAEL J. GARCIA
                          United States Attorney


                    By: _Thomas G. A. Brown_____
                          THOMAS G. A. BROWN
                          WILLIAM J. STELLMACH
                          Assistant United States Attorneys
                          Tel. No.: (212) 637-2194/2101